UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
(at Ashland)

| | | |
|---|---|---|
| THOMAS BIEDERMAN, | ) | |
| | ) | |
| Petitioner, | ) | Civil Action No. 0:22-CV-87-CHB |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| JESSE FERGUSON, Warden, | ) | **ORDER** |
| | ) | |
| Respondent. | ) | |

*** *** *** ***

This matter is before the Court on the Recommended Disposition and Order filed by United States Magistrate Judge Hanly A. Ingram, [R. 20]. The Recommended Disposition (hereinafter, "the RD") addresses Petitioner Thomas Biederman's Petition for Writ of Habeas Corpus, [R. 1], filed October 20, 2022, in which Petitioner seeks to vacate his state court conviction and sentence, and also seeks his immediate release or an order of re-trial. [R. 1, p. 16]. The RD, finding that Petitioner's Sixth Amendment right to trial by jury was violated during his state court proceedings, recommends that Petitioner's petition be conditionally granted and that Petitioner be resentenced. [R. 20, p.1]. On July 22, 2024, Respondent filed objections to the RD, [R. 21], as did Petitioner the next day, [R. 22]. Petitioner responded to Respondent's objections on August 5, 2024. [R. 26]. The matter is therefore fully briefed and ripe for review. For the following reasons, the Court will deny Petitioner's Petition for Writ of Habeas Corpus, [R. 1].

## I. BACKGROUND

### A. Petitioner's Trial, Appeal, and State Court Collateral Review

In November of 2012, Petitioner Thomas Biederman was convicted in the Boyd County Circuit Court of the use of a weapon of mass destruction in the second degree and attempted

murder. *Biederman v. Commonwealth*, 434 S.W.3d 40, 42 (Ky. 2014). The Kentucky Supreme Court, in affirming the case on direct appeal, described the facts of the case as follows:

> On July 28, 2011, [Biederman's then-wife] Janie Riggs's (Riggs) car exploded while parked in the garage outside her place of employment when a pipe bomb went off underneath her seat. Riggs testified that she heard an explosion and initially thought the airbag had malfunctioned. As a result of the explosion, Riggs suffered second and third degree burns, scarring on her arms and around her feet, hearing loss, post-traumatic stress disorder, and a possible foot fracture causing numbness throughout her leg.
>
> The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) investigated the case. ATF agent, Ron Sabotchick, testified that the ATF seized from Biederman his family computer, BBs, jumper leads, telephone wires, a Radio Shack altimeter, one of many cans of Polyvinyl chloride (PVC) cement, wire cutting tools, electrical connectors, and Radio Shack receipts. The forensic chemist for the ATF, Michelle Evans, testified that the items found at Biederman's home could be used to make a pipe bomb; however, she could not link the items found at the home to the components used in the pipe bomb that injured Riggs. Additionally, ATF agent, Gary Smith testified that the bomb that exploded in Riggs's vehicle was placed in the vehicle somewhere other than the garage where it exploded; and that the bomb was secured to the floorboard of the vehicle so as not to roll around while the vehicle was being driven.
>
> The Ashland Police Department (ADP) also investigated. Detective Gavin Patrick testified that the ATF seized Biederman's family computer, a search of which revealed several internet searches related to the construction of pipe bombs had been made between late March, 2011 through July 2011. The Commonwealth also presented evidence of the strained marriage between Biederman and Riggs, ridden with financial problems, and that the two possessed a $300,000 life insurance policy.
>
> In the Commonwealth's case, the Commonwealth played video of Biederman talking to two agents. In that video, Biederman told the agents that various people, his attorney, disgruntled neighbors, Jamaican telephone scammers, or church parishioners, could have wanted to kill Riggs. Biederman also told investigators that, as an appraiser in an alleged real estate class action lawsuit, he was going to receive $180,000,000 as a part of his fees for the case; therefore, he had no reason to be concerned with the $300,000 life insurance policy. Ultimately, based upon the aforementioned facts, Biederman was charged and convicted of the use of a weapon of mass destruction in the second degree and attempted murder.

434 S.W.3d at 42–43. Each of Petitioner's convictions, as Class B felonies, carried sentencing ranges of ten-to-twenty years. Recording of Proceedings, *Commonwealth v. Biederman*, No. 12-

CR-28 (Boyd Circuit Ct. Nov. 2, 2012) (02:13:00 p.m. to 02:13:14 p.m.); *see* Ky. Rev. Stat. § 527.205(3) (use of a weapon of mass destruction in the second degree); Ky. Rev. Stat. § 507.020(2) (murder as a capital offense); Ky. Rev. Stat. § 506.010(4)(b) (attempted capital offenses as Class B felonies). At the sentencing phase of the trial, the jury returned a verdict recommending twenty years' imprisonment as to each offense, running consecutively for a total sentence of forty years. Recording of Proceedings, *Commonwealth v. Biederman*, No. 12-CR-28 (Boyd Circuit Ct. Nov. 2, 2012) (02:54:23 p.m. to 02:55:05 p.m.). Later, at Petitioner's sentencing hearing, the judge imposed the recommended verdict and sentenced Petitioner to forty years' imprisonment, twenty years as to each count. *Id.* (Dec. 14, 2012) (12:06:50 p.m. to 12:07:09 p.m.).

Importantly, during Petitioner's sentencing, the trial judge sentenced him as a violent offender after determining that he caused "serious physical injury" to the victim—a finding that did not impact Petitioner's forty-year sentence but instead limited his parole eligibility pursuant to K.R.S. § 439.3401.[1] *Id.* (Dec. 14, 2024) (12:07:10 p.m. to 12:07:33 p.m.). As a result of the trial judge's determination and pursuant to K.R.S. § 439.3401, Petitioner was required to serve a greater portion of his sentence before becoming eligible for parole. While a non-violent offender was required to serve twenty percent of his or her sentence before becoming eligible for parole, Petitioner, having been designated a violent offender, was now required to serve either eighty-five

[1] After Biederman's conviction, the Kentucky legislature amended the violent offender statute. The Court refers to the version of the statute in effect at the time the crime was committed and Biederman was convicted. Under that version of the statute, the relevant provision states, "A violent offender who has been convicted of a capital offense or Class A felony with a sentence of a term of years or Class B felony who is a violent offender shall not be released on probation or parole until he has served at least eighty-five percent (85%) of the sentence imposed." KRS § 439.3401(3) (amended 2013). However, Kentucky courts have construed the violent offender statute to require violent offenders to serve eighty-five percent of their sentence or twenty years, whichever is less. *Hampon v. Commonwealth*, 133 S.W.3d 438, 444 (Ky. 2004) (discussing *Hughes v. Commonwealth*, 87 S.W.3d 850, 856 (Ky. 2002)).

percent of his total (forty-year) sentence or twenty years, whichever is less.[2] *See* K.R.S. § 439.3401(4); 501 Ky. Admin. Regs. 1:030, Section 3(1)(e); *Hughes v. Commonwealth*, 87 S.W.3d 850, 856 (Ky. 2002). After the Kentucky Supreme Court affirmed his conviction on direct appeal, Petitioner sought post-conviction collateral relief in the Kentucky state courts.[3] The Kentucky Court of Appeals, describing Petitioner's petition for collateral review, wrote:

> In March 2015, Biederman filed [a Kentucky Rule of Criminal Procedure] 11.42 motion to vacate, set aside, or correct his sentence, pro se. Subsequently, the trial court appointed the Department of Public Advocacy ("DPA") to represent Biederman in the proceedings and the DPA supplemented his motion in October 2016. The supplemented motion claimed: (1) trial counsel was ineffective for agreeing to prohibit jurors from taking their notes into the jury room during deliberations; and (2) trial counsel was ineffective for failing to adequately investigate and therefore did not present an effective defense at trial.
>
> The trial court held a series of evidentiary hearings on those claims, in which all parties were present, and [trial counsel (hereinafter "TC")] Curtis testified as to his trial strategy. Specifically, TC Curtis explained that he agreed with the Commonwealth to prohibit jurors from taking their notes to deliberation because he noticed the jurors were "furiously writing" while watching a video of Biederman's interviews with Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") agents. He further testified that he wanted the jurors to have to recall the specifics of those interviews from memory because the contents did not show Biederman in the best light. TC Curtis emphasized that to this day, he still prefers that jurors leave their notes outside the deliberation room.
>
> Additionally, TC Curtis testified as to his general trial strategy and preparation. He stated that he would have interviewed every witness Biederman provided, if he was able to get ahold of them. Of those he was able to contact, he recalled that many mentioned that Biederman periodically set bombs off in his backyard. After speaking with those witnesses, TC Curtis determined it was not in Biederman's best interest to have those individuals testify. This included Biederman's son, Ryan.
>
> As for the victim's injuries, TC Curtis testified that he needed to use "kid gloves" to poke holes in the severity of her injuries without blatantly calling her a liar. He

---

[2] As a result of the trial judge's factfinding, Petitioner will become eligible for parole after twenty years—the lesser between twenty years and eighty-five percent of forty years (or thirty-four years)—instead of after eight years. In other words, the trial judge's factfinding requires Petitioner to serve an additional twelve years incarcerated.

[3] Because Petitioner's sentence was greater than twenty years, Petitioner appealed the conviction as a matter of right directly to the Kentucky Supreme Court pursuant to Kentucky Constitution § 110(2)(b).

testified that such a gentle approach is necessary to stay in the jury's good graces. Lastly, TC Curtis testified that he did not call experts because he did not think they would be useful in his overall strategy of showing that these events did occur—which he claimed would be obvious to the jury—but that Biederman was not the one who caused them. He explained that calling experts would have gone "against the credibility of what [he was] trying to do in convincing the jury that Biederman didn't do it." TC Curtis emphasized that the key to the entire case was the fact that the bomb was wired to the brake light and the victim's key fob had been tampered with to ensure the brake light would not activate unless the victim was in the car. Therefore, he claimed, an explosive expert would do little to convince a jury that Biederman did not tamper with the key fob.

After multiple days of evidentiary hearings and the submission of post-hearing briefs, the trial court denied Biederman's RCr 11.42 motion in its August 2020 order. The order concluded that TC Curtis advised Biederman of his decision to prohibit juror notes during deliberations and Biederman agreed with the approach; that TC Curtis was not deficient in failing to consult with experts; and that TC Curtis properly interviewed all the witnesses Biederman suggested.

In December 2020, Biederman filed a [Kentucky Rules of Civil Procedure] 60.02 motion to vacate his sentence pursuant to subsections (e) and (f). Biederman claimed that he was entitled to immediate relief because (1) he was presented with new hospital information about the severity of the victim's injuries that established he was guilty of only second-degree assault; (2) the Commonwealth withheld exculpatory evidence; and (3) there were multiple instances during trial in which the Commonwealth and its witnesses committed perjury.

In July 2021, the trial court denied Biederman's CR 60.02 motion finding that Biederman had full access to the medical records he complained were "new"; that those same medical records were used at trial and introduced as an exhibit; and that the Kentucky Supreme Court had already adjudicated the severity of the victim's injuries. As to the remainder of Biederman's claims, the trial court found that all of the evidence was provided in discovery or that Biederman could have easily obtained such information. Lastly, the trial court found that Biederman was aware of all facts and allegations at trial, and he was not entitled to the special, extraordinary relief under CR 60.02.

*Biederman v. Commonwealth*, No. 2020-CA-1066-MR, 2022 WL 3007472, at *2–3 (Ky. Ct. App. 2022). On July 29, 2022, the Kentucky Court of Appeals' collateral review affirmed the Boyd Circuit Court, and Petitioner did not appeal to the Kentucky Supreme Court.[4]

**B. Petitioner's Federal Habeas Corpus Claims**

On October 7, 2022, Petitioner timely filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, [R. 1]. Petitioner raised eight grounds for relief, listed as follows (hereinafter, "Ground One," "Ground Two," etc.):

1. Convictions of both use of a weapon of mass destruction in the second degree and attempted murder violates the prohibition on double jeopardy;
2. Wrongly sentenced as a violent offender;
3. Structural error in refusing to allow the jury to use notes during deliberations;
4. Wrongly denied directed verdict;
5. Ineffective assistance of counsel for agreeing to prohibit the use of the jurors' notes during deliberations;
6. Ineffective assistance of counsel for failing to investigate and prepare a defense;
7. Newly discovered hospital evidence on the severity of the alleged Victim's injury;
8. Commonwealth withheld exculpatory evidence.

*Id.* at 4–13. Petitioner seeks to vacate his state court conviction and sentence, and also seeks his immediate release or an order of re-trial. *Id.* at 16.

The RD determined that Petitioner was entitled to habeas relief as to his Ground Two claim, finding the trial judge violated Petitioner's Sixth Amendment right to a jury trial. *Id.* at 1–2. Specifically, the RD found the violation lay in the trial judge's failure to submit to the jury the

---

[4] Kentucky Rule of Criminal Procedure 12.05, in effect at the time of Petitioner's state habeas petition, did not require Biederman to seek collateral habeas review with the Kentucky Supreme Court to exhaust his claims. Ky. R. Crim. P. 12.05 (amended Jan. 1, 2023).

question of whether the victim suffered "serious physical injury," and to instead make that determination himself and, accordingly, sentence Petitioner as a violent offender. *Id.* at 14–19. The RD found Petitioner's other grounds for relief lacked merit. *Id.* at 41–58.

The parties each filed objections to the RD, [R. 21]; [R. 22], and Petitioner also filed a Response to Respondent's objections, [R. 26]. This matter is therefore ripe for review.

## II. LEGAL STANDARD

Under 28 U.S.C. § 636(b)(1)(B), a district court judge may designate a Magistrate Judge to conduct evidentiary hearings and submit proposed findings of fact and recommendations for the disposition of certain motions, including motions to suppress evidence. Within fourteen days of being served a copy of that recommended disposition, any party may file written objections to the Magistrate Judge's proposed findings and recommendation. 28 U.S.C. § 636(b)(1). This Court must then "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.*; *see also Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). A specific objection, which preserves the issue for appeal, "explain[s] and cite[s] specific portions of the report which [counsel] deem[s] problematic." *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 1997) (quoting *Smith v. Chater*, 121 F.3d 709, 1997 WL 415309, *2 (6th Cir. 1997)) (internal quotation marks omitted). Courts need not conduct de novo review of general objections that fail to identify specific factual or legal issues, because it duplicates the Magistrate Judge's efforts and wastes judicial economy. *Howard v. Sec. of Health and Human Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Ultimately, a district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

## III. ANALYSIS

The parties' objections only addressed the RD's conclusions as to Ground Two, Ground Four, and Ground Six. *See* [R. 21]; [R. 22]. The Court therefore reviews the RD de novo only as to Grounds Two, Four, and Six. The Court begins with Ground Two.

### A. Ground Two: Trial by Jury

#### 1. Magistrate Judge's Recommended Disposition

On July 9, 2024, the magistrate judge issued his RD, [R. 20], recommending that the Court conditionally grant Petitioner's petition and re-sentence Petitioner within ninety days thereafter. *Id.* at 1. First, regarding the procedural considerations in Petitioner's habeas petition, the magistrate judge found that Petitioner did not procedurally default on his Ground Two claim. *See id.* at 9–10. Then, the magistrate judge determined that the Kentucky Supreme Court's affirmation of Petitioner's conviction was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" under 28 U.S.C. § 2254(d). *Id.* at 12–19. Finally, the magistrate judge determined that this error was not harmless. *Id.* at 19–40.

Petitioner did not object to the magistrate judge's Ground Two analysis. *See generally* [R. 22]. Respondent, however, raised three objections to the magistrate judge's analysis, *see* [R. 21], which the Court discusses in greater detail below. *See infra*.

#### 2. Respondent's Objections

##### *a. Procedural Default*

The RD determined that Petitioner "arguably procedurally defaulted on his trial by jury claim" since he "failed to raise the [Ground Two] issue in the trial court and Kentucky's Supreme Court arguably enforced the Commonwealth's rule forbidding raising arguments for the first time

on appeal by reviewing his claim under a plain error standard of review." [R. 20, p. 9]. However, the RD ultimately concluded that (1) any potential procedural default was excused because Petitioner could show both cause and prejudice as to his ground two claim and (2) any procedural default was waived by Respondent because Respondent failed to address it in his responses to Petitioner's petition, so the Court need not consider the procedural default issue at all. *See id.* at 9–10.

Respondent objects to these conclusions. Respondent claims that Petitioner procedurally defaulted on his claim because he did not object at his sentencing to the trial judge's determination that he caused "serious physical injury" to the victim. *See* [R. 21, p. 2]. Respondent thus asserts that Petitioner failed to comply with Kentucky's "cotemporaneous objection rule," thereby foreclosing federal habeas review. *See id.* Further, Respondent argues that Petitioner cannot establish cause or prejudice to excuse his procedural default. *See id.* at 3–4. According to Respondent, Petitioner cannot show cause because he could have cited to *Apprendi* at trial in making the same objection Petitioner now raises. *See id.* at 3. And, Petitioner cannot show prejudice because the victim's testimony at trial "overwhelmingly established" that she suffered "serious physical injury," meaning any alleged constitutional violation when the trial judge made a similar finding did not work to [Petitioner's] 'actual and substantial disadvantage.'" *Id.* at 3–4 (quoting *Ramirez*, 596 U.S. at 379–80).

Petitioner responded to this objection. *See* [R. 26]. First, Petitioner reiterates that he "can show cause and prejudice to excuse any procedural default" and "Respondent waived the issue by proceeding straightaway to the merits" in his Answer. *Id.* at 1–2. As to cause and prejudice, Petitioner argues that despite the availability of *Apprendi* at the time of his conviction as a means to advance his Sixth Amendment claim, such an argument under *Apprendi* was foreclosed by

*Harris v. United States*, 536 U.S. 545 (2002), a Supreme Court decision only overruled by *Alleyne*. *Id.* at 2. According to Petitioner, Respondent fails to "explain how *Apprendi* could have held that any fact increasing the minimum punishment must be submitted to a jury when the Supreme Court held precisely the opposite in *Harris* just two years after deciding *Apprendi*." *Id.* Petitioner also notes that only *Alleyne*, not also *Apprendi*, addresses increases to the minimum punishment, meaning that "the *Alleyne* argument [relevant to Petitioner] was not available to [Petitioner] at the time of sentencing." *Id.* Further, Petitioner points out that the Commonwealth argued in its brief in Petitioner's direct appeal that *Apprendi* did not support Petitioner's Sixth Amendment claim, meaning that "Respondent, who now stands in the shoes of the Commonwealth, should be estopped from asserting a contrary position here." *Id.* Finally, Petitioner reiterates that "Respondent waived any procedural default argument by failing to include it in the Answer" and further argues that Respondent "waived any argument that this Court should consider procedural default sua sponte by failing to put flesh on the bones of the argument in the Objection." *Id.* at 4.

For the reasons that follow, this Court agrees in part and disagrees in part with the RD's conclusions. Although it is not clear whether Respondent waived the procedural default issue in his response, the Court can consider the issue *sua sponte* regardless. In consideration of the issue, Petitioner procedurally defaulted, but because Petitioner can show cause and prejudice,[5] as discussed below, the default is excused and the Court may therefore consider the merits of Petitioner's Ground Two claim.

Petitioner's first argument—that Respondent's waiver of the state's procedural default argument prevents this Court from considering it—is unpersuasive. "Waiver is the intentional

---

[5] That is, if Plaintiff's Sixth Amendment claim is meritorious, he can show prejudice. The Court later concludes that Petitioner's Sixth Amendment claim is not meritorious. *See infra* Section III(A)(2)(b).

relinquishment or abandonment of a known right." *Wood*, 566 U.S. at 474 (citations and quotations omitted). The Supreme Court, in discussing whether a waiver occurs, has contrasted an "inadvertent error" with "[knowledge of] an arguable . . . defense" alongside the "cho[ice], in no uncertain terms, to refrain" from challenging a habeas petition based on the defense. *Id.* (citation and quotations omitted). Here, as the RD notes, Judge Ingram had ordered Respondent to address procedural issues in his response, *see* [R. 20, p. 10 (citing [R. 4, p. 2])], yet Respondent did not do so—a fact Respondent later admits. *See* [R. 10]; [R. 21, p. 2 ("[Respondent] did not raise procedural default in his Rule 5 Answer . . . ."). Based on these facts, it is unclear whether Respondent has truly waived the procedural default issue, since although Respondent was expressly informed by Judge Ingram to address any "procedural bar[s]," Respondent did not "cho[ose], in no uncertain terms, to refrain" from raising the issue via an express waiver. *Cf. Wood*, 566 U.S. at 474. Rather, Respondent's neglect may have been mere "inadvertent error." *See id.*

Even if Respondent waived the issue, though, the Supreme Court and the Sixth Circuit have made clear that this Court may consider Petitioner's procedural default. The Supreme Court has noted that "the Courts of Appeals have unanimously held that, in appropriate circumstances, courts, on their own initiative, may raise a petitioner's procedural default . . . ." *Day v. McDonough*, 547 U.S. 198, 206–07 (2006) (collecting cases). The Sixth Circuit likewise maintains that although "[p]rocedral default is normally 'a defense that the State is obligated to raise and preserve if it is not to lose the right to assert the defense thereafter,'" the state's failure to "'argue procedural default in the district court does not entitle a habeas petitioner to a merits-based review of his claim.'" *Arias v. Lafler*, 511 F. App'x 440, 444 (6th Cir. 2013) (first quoting *Sowell v. Bradshaw*, 372 F.3d 821, 830 (6th Cir. 2004); and then quoting *Trest v. Cain*, 522 U.S. 87, 89 (1997)). Accordingly, this Court will consider whether Petitioner procedurally defaulted and, if so, whether

that default is nevertheless excused.

A federal habeas claim procedurally defaults if it was denied in the state courts "based on an adequate and independent state procedural rule." *Davila v. Davis*, 582 U.S. 521, 527 (2017). But "[a] state prisoner may overcome the prohibition on reviewing procedurally defaulted claims if he can show 'cause' to excuse his failure to comply with the state procedural rule and 'actual prejudice resulting from the alleged constitutional violation.'" *Id.* at 528 (quoting *Wainwright v. Sykes*, 433 U.S. 72, 84 (1977)). "[W]here a constitutional claim is so novel that its legal basis is not reasonably available to counsel, a defendant has cause for his failure to raise the claim in accordance with applicable state procedures." *Reed v. Ross*, 468 U.S. 1, 16 (1984). And, to establish prejudice, a petitioner must show that "errors at his trial . . . worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

Here, as the RD notes, Petitioner "arguably procedurally defaulted on his trial by jury claim" since he "failed to raise the issue in the trial court and Kentucky's Supreme Court arguably enforced the Commonwealth's rule forbidding raising arguments for the first time on appeal by reviewing his claim under a plain error standard of review." [R. 20, p. 9]. However, without deciding that Petitioner actually procedurally defaulted, the Court agrees with the RD's subsequent conclusion that even if Petitioner procedurally defaulted, Petitioner could establish both cause and prejudice if his Sixth Amendment claim is meritorious. *See id.* at 9–10.

Petitioner has cause for any procedural default because his Sixth Amendment claim now relies on *Alleyne*, a decision issued in 2013 while Petitioner's case was on direct appeal. *Alleyne* overruled *Harris v. United States*, which had foreclosed Petitioner's argument by holding that no Sixth Amendment violation occurred when judge-found facts triggered an increase in a

defendant's mandatory minimum sentence. *See Alleyne*, 570 U.S.; *Harris*, 536 U.S. Therefore, because Petitioner's Sixth Amendment argument would have gone against established Supreme Court precedent at the time, Petitioner's argument was "so novel that its legal basis is not reasonably available to counsel." *Cf. Reed*, 468 U.S. at 16. If Petitioner's Sixth Amendment claim is meritorious,[6] Petitioner could also establish prejudice, since the trial judge's potential error in improperly conducting fact-finding that was constitutionally meant for the jury would have "worked to [Petitioner's] *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Cf. Frady*, 416 U.S. at 170.

Taken together, the Court concludes that any procedural default by Petitioner would be excused *if* Petitioner's Sixth Amendment claim is meritorious, since under those circumstances, Petitioner would be able to establish both cause and prejudice.[7] Accordingly, the Court will now consider the merits of Petitioner's Sixth Amendment argument.

*b. Sixth Amendment Right to Jury Trial*

The Antiterrorism and Effective Death Penalty Act ("AEDPA") provides the standard for assessing state prisoners' claims to federal postconviction relief. *See* 28 U.S.C. § 2254; *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("As amended by AEDPA, 28 U.S.C. § 2254 sets several limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner."). Pursuant to AEDPA, "[t]he Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus [on] behalf of a

---

[6] The Court later concludes that Petitioner's Sixth Amendment claim is not meritorious. *See infra* Section III(A)(2)(b).

[7] In other words, the Court's merits analysis as to Petitioner's Sixth Amendment claim also determines whether Petitioner procedurally defaulted, since it establishes whether Petitioner can show prejudice to excuse any procedural default. Because the Court finds Petitioner's Sixth Amendment claim fails on the merits, *see infra* Section III(A)(2)(b), Plaintiff is not entitled to habeas relief on his Ground Two claim regardless of whether the Court finds he procedurally defaulted.

person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." *Id.* § 2254(a). However, such an application

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The factual findings of the state court are "presumed to be correct," and the petitioner must present "clear and convincing evidence" to rebut the presumption of correctness. *Id.* § 2254(e)(1). The AEDPA standard is therefore "difficult to meet," as it is "highly deferential" and "demands that state-court decisions be given the benefit of the doubt." *Cullen*, 563 U.S. at 181 (first quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011); and then quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (citations and quotations omitted)).

In the present case, Petitioner argues that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law." *See* 28 U.S.C. § 2254; *see generally* [R. 1 (Petition)]. Under AEDPA, "clearly established Federal law" is "determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), meaning circuit precedent "cannot form the basis for habeas relief under AEDPA." *Parker v. Matthews*, 567 U.S. 37, 48 (2012). Only holdings—not dicta—constitute "clearly established Federal law." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). Moreover, "if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision." *White v. Woodall*, 572 U.S. 415, 426 (2014) (citation modified).

This is because § 2254(d)(1) "provides a remedy for instances in which a state court unreasonably *applies* [Supreme Court] precedent; it does not require state courts to *extend* that precedent or license federal courts to treat the failure to do so as error." *Id.* (citation omitted). Additionally, a prisoner seeking federal habeas relief may only rely on new constitutional rules of criminal procedure announced before the prisoner's conviction becomes final. *Teague v. Lane*, 489 U.S. 288, 310 (1989). "Finality occurs when direct state appeals have been exhausted and a petition for writ of certiorari from this Court has become time barred or has been disposed of." *Greene v. Fisher*, 565 U.S. 34, 39 (2011) (citing *Griffith v. Kentucky*, 479 U.S. 314, 321 n.6 (1987)). Here, Petitioner's direct state appeals were exhausted when the Kentucky Supreme Court issued its decision on June 19, 2014. *See Biederman*, 434 S.W. 3d. Accordingly, the state court decision became "final" ninety days later, on September 17, 2014. *See* Sup. Ct. Rule 13.1 ("[A] petition for writ of certiorari . . . is timely when it is filed with the Clerk of this Court within 90 days after entry of the judgment."). Thus, to succeed on his Sixth Amendment claim, Petitioner must demonstrate that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law," meaning holdings (not dicta) of the Supreme Court issued before September 17, 2014.

Applying these requirements, Petitioner's Sixth Amendment claim could rely on multiple sources of "clearly established Federal law": the Supreme Court's decisions in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Alleyne v. United States*, 570 U.S. 99 (2013). First, *Apprendi* established what types of facts must be submitted to and determined by juries in criminal cases: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. Before *Alleyne*, the Supreme Court ruled in *Harris v. United States*, 536

U.S. 545 (2002) that *Apprendi* applied only to facts that pushed a sentence above the statutory *maximum*, and made no judgment on facts that affected the statutory *minimum* sentence. *See Harris*, 536 U.S. at 557 (2002). After *Alleyne*, which overruled *Harris*, facts affecting either the statutory maximum or minimum had to be submitted to a jury. *Alleyne*, 570 U.S. at 103 ("Any fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt.").

In the present case, Petitioner argues that a fact found by the trial judge—the fact that the victim suffered "serious physical injury"—was the type of fact that should have been found by a jury instead, since that fact increased the portion of his sentence that he must serve before becoming eligible for parole. *See* [R. 1, pp. 5–6]. The magistrate judge's RD agreed with Petitioner and determined the judge's actions violated his Sixth Amendment right to a jury trial.

In finding as such, the magistrate judge's RD relied on *Apprendi*, *Alleyne*, and the Sixth Circuit's decision in *Robinson v. Woods*, 901 F.3d 710, 717 (6th Cir. 2018). In *Alleyne*, the Supreme Court ruled unconstitutional a sentencing scheme in which a judge-found fact increased a defendant's minimum sentence from five years to seven years. 570 U.S. at 115–16. According to the Supreme Court, the mere fact that the higher seven-year sentence was still within the statutorily-prescribed range for the crime—five years to life—was "beside the point," since the constitutional issue lay in the judge-found facts "aggravat[ing] the legally prescribed range of allowable sentences, . . . regardless of what sentence the defendant *might* have received." *Id.* at 114–115 (emphasis in original). The RD analogizes *Alleyne*'s reasoning to Petitioner's case, noting that, just as the trial court in *Alleyne* had discretion to sentence the defendant there to seven years in prison (even in the absence of a mandatory minimum), the parole board in Petitioner's case could also deny Petitioner parole until he served eighty-five percent of his sentence or twenty years

(regardless of whether he was classified as a violent offender). *See* [R. 20, p. 17]. In other words, according to the RD, just because the judge in *Alleyne* and the parole board in Petitioner's case *could* have required the defendant in each case to serve the same amount of time as the sentence actually imposed as a result of the judge's factfinding at sentencing does *not* necessarily mean that such judicial factfinding is constitutionally permissible. *See id.*

The RD also relies on *Robinson*, a Sixth Circuit case interpreting both *Apprendi* and *Alleyne* in which Michigan's sentencing scheme was found unconstitutional. *Robinson*, 901 F.3d at 718. The Court discusses *Robinson* in greater detail below. *See infra*. As to the RD's analysis of *Robinson*, the RD determines that the unconstitutionality of the Michigan scheme lay in the fact that it permitted judicial factfinding to "increase[] the period of time a defendant must serve before becoming parole eligible." [R. 20, p. 14 (citing *Robinson*, 901 F.3d at 710, 712, 717)]. So, because "Kentucky's violent offender statute, as it was applied here, delayed [Petitioner's] parole eligibility from when he completes twenty percent of his sentence to when he completes eighty-five percent of his sentence" or twenty years, whichever is less, based on judge-found facts, the RD finds Kentucky's violent offender statute, as applied to Petitioner, also violates *Apprendi* and *Alleyne*. *Id.* (citing 501 Ky. Admin. Regs. 1:030, Section 3).

Based on this analysis, the RD finds that the Kentucky Supreme Court's affirmation of Petitioner's conviction was both "contrary to" and an "unreasonable application of" clearly established federal law. *See id.* at 13–19; 28 U.S.C. § 2254(d)(1).

Respondent objects to the RD, arguing its reasoning is flawed in multiple ways. First, Respondent claims the magistrate judge "improperly extended the rationale in *Alleyne* before applying it" to Petitioner's case. *Id.* at 4. Specifically, Respondent claims *Alleyne* does not apply to the judge's determination in Petitioner's case that Petitioner caused "serious physical injury"

because that factual finding "impacted [Petitioner's] parole eligibility, not his statutorily prescribed sentencing range like in *Alleyne*." [R. 21, p. 5]; *see Alleyne*, 570 U.S. at 103. Respondent also argues the magistrate judge was mistaken in relying on *Robinson* for two reasons. For one, Respondent notes that "circuit precedent does not constitute clearly established Federal law, as determined by the Supreme Court," meaning the case cannot support habeas relief. [R. 21, p. 6 (quoting *Glebe v. Frost*, 574 U.S. 21, 24 (2014))]; *see* 28 U.S.C. § 2254(d). And, Respondent distinguishes between the harm to the defendant in *Robinson* and the harm to Petitioner here. According to Respondent, the Michigan sentencing scheme in *Robinson* was unconstitutional because the judge's factual finding there affected the defendant's minimum sentence; by contrast, Petitioner's sentencing is constitutional because the judge-found fact *does not* affect his minimum sentence and only affects his parole eligibility date. [R. 21, pp. 6–8].

Petitioner responded to these objections. *See* [R. 26]. In response to the Respondent's argument that "parole eligibility does not impact the actual sentence because parole is a distinct concept from sentencing," Petitioner argues that Respondent is "point[ing] to differences between the Michigan sentencing scheme at issue in *Robinson* and the Kentucky scheme at issue here" without showing how one scheme is constitutional and the other is not. *Id.* Petitioner describes Respondent's argument as "essentially that while a Michigan judge's finding under a [mandatory] guidelines system [like Michigan's] may violate *Alleyne*, that exact same finding under a [non-mandatory] non-guidelines system [like Kentucky's] does not." *Id.* According to Petitioner, the distinction between mandatory guidelines systems and non-mandatory non-guidelines systems is one "without a difference," since the judge's factual finding of "serious physical injury" in Petitioner's case "increased [Petitioner's] minimum sentencing exposure in violation of *Alleyne* in a *substantively identical* manner as a Michigan judge's findings of fact under the mandatory

guidelines system," meaning that Petitioner here is entitled to relief just like the petitioner in *Robinson*. *Id.* at 5–6 (emphasis added).

To summarize the dispute between Petitioner and Respondent in other words, the parties here essentially disagree as to whether the state judge's finding of fact that Petitioner was a violent offender—a finding that increased the proportion of Petitioner's sentence that Petitioner had to serve incarcerated before becoming eligible for parole—effectively imposed a mandatory minimum sentence in violation of *Alleyne*. In essence, while Petitioner argues that the delayed parole eligibility date effectively imposes a mandatory minimum sentence, Respondents contend that delayed parole eligibility merely increases the portion of the sentence Petitioner must serve incarcerated but does not affect the length of the sentence itself. *See* [R. 21, pp. 4–5]; [R. 26, pp. 4–6]. As outlined below, although the Court harbors concern about the practical effect of judicial factfinding pursuant to Kentucky's violent offender statute, the Court finds the statute does not violate *Apprendi* or *Alleyne* such that habeas relief is appropriate in this case. Because the violent offender statute merely pushed back Petitioner's parole eligibility date—and thus involves a context distinct from the mandatory minimum in *Alleyne* that would require this Court to extend, rather than apply, *Alleyne*'s rationale—the Kentucky Supreme Court's decision upholding his sentence was not contrary to or an unreasonable application of clearly established federal law.

The Court begins its analysis by examining the *Apprendi* decision.[8] As briefly discussed above, the Supreme Court in *Apprendi* held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. In *Apprendi*, the fact

[8] Although, as previously discussed, "clearly established Federal law" under § 2254(d) refers only to Supreme Court holdings, not dicta, *Williams*, 529 U.S. at 412, the Court here examines the Supreme Court's dicta in *Apprendi* and *Alleyne* to flush out the meaning of the "clearly established" holdings in those cases.

that increased the defendant's sentence for unlawfully possessing a prohibited weapon was whether his "purpose" in possessing that weapon was "to intimidate" his victim on the basis of a particular characteristic (like race). *Id.* at 491. The state's sentencing scheme allowed the judge to make this factual finding, by a preponderance of the evidence, at the sentencing stage. *Id.* Without that factual finding, the charge carried a ten-year maximum; however, upon making that factual finding, the sentencing judge applied a hate crime enhancement that allowed for a maximum sentence of twenty years on that count. *Id.* at 470. The judge ultimately made that factual finding, applied the enhancement, and imposed a twelve-year sentence on that count. *Id.* at 471.

In reviewing this procedural history, the *Apprendi* Court described the judge's factfinding as "legally significant because it increased—indeed, it doubled—the maximum range within which the judge could exercise his discretion, converting what otherwise was a maximum [ten]-year sentence on that count into a minimum sentence." *Id.* at 474. The Court was then faced with the "constitutional question" of "whether the [twelve]-year sentence imposed on [the charge of unlawfully possessing a prohibited weapon] was permissible, given that it was above the [ten]-year maximum for the offense charged in that count." *Id.*

In answering that question, the Court first noted that the Sixth Amendment's right to a trial by jury, together with the Fourteenth Amendment's right to due process of law, entitles a state criminal defendant to have a jury determine their guilt as to every element of the charged offense(s) beyond a reasonable doubt.[9] *See id.* at 476–77. The Court then considered the distinction between an "element" of an offense and a "sentencing factor." It described sentencing factors as "fact[s] that [were] not found by a jury but that could affect the sentence imposed by the judge." *Id.* at 485.

---

[9] The same is true in cases involving a federal statute, although the Fifth Amendment provides the right to due process in such cases. *Apprendi*, 530 U.S. at 476.

Such sentencing factors could raise "serious constitutional concern" if they exposed the defendant to greater or additional punishment. *Id.* at 486 (discussing its earlier ruling in *McMillan v. Pennsylvania*, 477 U.S. 79 (1986)). However, the Court explained, statutory sentencing factors have passed constitutional muster where they "neither alter[] the maximum penalty for the crime committed nor create[] a separate offense calling for a separate penalty," and instead "operate[] solely to limit the sentencing court's discretion in selecting a penalty within the range already available to it without [that additional factual finding]." *Id.* (quoting *McMillan*, 477 U.S. at 87–88). Thus, the Court made clear, it was not suggesting that it is impermissible for judges "to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment *within the range* prescribed by statute." *Id.* at 481. But this type of permissible judicial factfinding as to sentencing factors differs from impermissible judicial factfinding that "increase[s] punishment beyond the maximum of the statutory range." *Id.* at 488; *see also id.* at 484 ("If a defendant faces punishment beyond that provided by statute when an offense is committed under certain circumstances but not others, it is obvious that both the loss of liberty and the stigma attaching to the offense are heightened; it necessarily follows that the defendant should not—at the moment the State is put to proof of those circumstances—be deprived of protections that have, until that point, unquestionably attached.").

The Court grounded this discussion in an historical analysis of the "link between verdict and judgment" and the role of judge and jury in each. *Id.* at 482. The Court first acknowledged the "historic link" between a verdict rendered by a jury and the judgment that would ultimately follow as a result. *Id.* The Court next noted that judicial discretion in sentencing has been "consistent[ly] limit[ed]," such that judges had "to operate within the limits of the legal penalties provided." *Id.* Given the "historic link between verdict and judgment," and this limitation on judicial discretion

at the judgment stage, it would be quite unusual to see a legislative scheme that permitted judges—not juries—to find facts that would permit them to impose a greater penalty than "the maximum [the defendant] would receive if punished according to the facts reflected in the jury verdict alone." *See id.* at 482–83.

The Court wrote elsewhere that its historical analysis led it to the following conclusion:

> The evidence we describe that **punishment was, by law, tied to the offense** (enabling the defendant to discern, barring pardon or clergy, his punishment from the face of the indictment), and the evidence that American **judges have exercised sentencing discretion within a legally prescribed range** (enabling the defendant to discern from the statute of indictment what maximum punishment conviction under that statute could bring), point to a single, consistent conclusion: The judge's role in sentencing is constrained at its outer limits by the facts alleged in the indictment and found by the jury.

*Id.* at 483 n.10 (emphasis added). "Put simply," the Court explained, "facts that expose a defendant to a punishment greater than that otherwise legally prescribed were by definition 'elements' of a separate legal offense." *Id.*

From this historical analysis, the *Apprendi* Court drew a specific line regarding judicial factfinding. Where judicial factfinding pertains to sentencing factors—meaning it results in a sentence "*within* the range already available to [the court]" as determined by the jury's finding that the defendant was guilty under the statute of conviction—such judicial factfinding does not trudge upon the jury's role. *Id.* at 486 (emphasis added). By contrast, constitutional issues arise under the Sixth Amendment and the Fifth or Fourteenth Amendment where a judge "determine[s] a 'fact' [that increases] punishment *beyond* the maximum of the statutory range" authorized by the jury's verdict. *Id.* at 476, 488 (emphasis added). Accordingly, because the jury in *Apprendi* convicted that defendant of an offense carrying a statutory maximum term of ten years' imprisonment, yet the judge's factfinding purported to extend the maximum term to twenty years' imprisonment, the judge's factfinding was unconstitutional.

Several years after *Apprendi* addressed judicial factfinding that increased the statutory *maximum* term of imprisonment, the *Alleyne* Court determined that "the principle applied in *Apprendi* applies with equal force to facts increasing the mandatory *minimum*." 570 U.S. at 112 (emphasis added). The *Alleyne* Court also grounded its analysis in a historical discussion of the role of judges and juries and the relationship between crime and punishment. First, the Court noted that some early American statutes "provided *ranges* of permissible sentences," but those "ranges themselves were linked to particular facts constituting the elements of the crime." 570 U.S. at 108–09 (emphasis in original) (citations omitted). The Court explained, "This linkage of facts with particular sentence ranges (defined by both the maximum and the minimum) reflects the intimate connection between crime and punishment." *Id.* at 109. Thus, "[i]f a fact was by law essential to the penalty, it was an element of the offense." *Id.* These basic and "widely recognized principles" resulted in "a well-established practice of including in the indictment, and submitting to the jury, every fact that was a basis for imposing or increasing punishment." *Id.* at 109–110. And consistent with these principles, the Court in *Apprendi* had "concluded that any 'facts that increase the prescribed range of penalties to which a criminal defendant is exposed' are elements of the crime." *Id.* at 111 (quoting *Apprendi*, 530 U.S. at 490).

In concluding that these same principle applied in *Apprendi* also apply "with equal force to facts increasing the mandatory minimum," the Supreme Court first noted the obvious and "indisputable" conclusion that "a fact triggering a mandatory minimum alters the prescribed range of sentences to which a criminal defendant is exposed," *id.* at 112 (citation omitted), and thereby "*aggravate*[*s*] the punishment." *Id.* at 113 (emphasis in original) (citation omitted). That is, while some factual findings might increase the maximum penalty (thereby "mark[ing] the outer boundary of the range"), others may increase "the floor," or the minimum penalty. *Id.* at 112. "And

because the legally prescribed range *is* the penalty affixed to the crime, . . . it follows that a fact increasing either end of the range produces a new penalty and constitutes an ingredient of the offense." *Id.*

The *Alleyne* Court reasoned that judicial factfinding that imposes a mandatory minimum term of incarceration is unconstitutional because it effectively *forbids* sentences previously authorized by the jury that fall below the new mandatory minimum, and thereby allows the judge to artificially alter the range of sentences available under the statute of conviction without submitting those additional facts to a jury. *See id.* at 113–114, 116; *see also id.* at 113–114 ("Defining facts that increase a mandatory statutory minimum to be part of the substantive offense enables the defendant to predict the legally applicable penalty from the face of the indictment. It also preserves the historic role of the jury as an intermediary between the State and criminal defendants." (internal citations omitted)). In ruling as such, the *Alleyne* Court (like the *Apprendi* Court) made an important distinction between two types of factfinding: (1) factfinding that "increase[s] either the statutory maximum or minimum," which must be conducted by a jury because such facts "both alter[] the legally prescribed range *and* do[] so in a way that aggravates the penalty"; and (2) "factfinding used to guide judicial discretion in selecting a punishment '*within* limits fixed by law.'" *Id.* at 113 n.2 (quoting *Williams v. New York*, 337 U.S. 241, 246 (1949) (emphasis added)). This latter form of judicial factfinding—elsewhere described by the Court as the consideration of "sentencing factors," *see McMillian*, 477 U.S. at 88 (describing sentencing factors as those that "limit the sentencing court's discretion in selecting a penalty within the range already available to it")—"may lead judges to select sentences that are more severe than the ones they would have selected without those facts, [but] the Sixth Amendment does not govern that element of sentencing," 570 U.S. at 113 n.2. The *Alleyne* Court later reiterated the distinction

between "establishing what punishment is available by law and setting a specific punishment within the bounds that the law has prescribed." *Id.* at 117 (quoting *Apprendi*, 530 U.S. at 519 (Thomas, J., concurring)). The former is the role of the jury, and thus the concern of *Apprendi* and *Alleyne*; the latter is the role of the judge, and thus left to judicial discretion. *See id.*

Accordingly, for this Court to find that the trial judge's factfinding in Petitioner's case (i.e., that the victim suffered "serious physical injury") violated the Sixth Amendment as Petitioner alleges, that factfinding must alter the legally prescribed penalty range in a way that aggravates the penalty. But the record does not support this conclusion for two related reasons. First, the sentence the trial judge imposed—twenty years as to each count—*was* within the range authorized by the jury pursuant to the statutes of conviction, which authorized ten to twenty years of imprisonment for each count. *See* Recording of Proceedings, *Commonwealth v. Biederman*, No. 12-CR-28 (Boyd Circuit Ct. Nov. 2, 2012) (2:12:58 p.m. to 2:13:26) (on file with the Kentucky Office of the Attorney General); *id.* (Nov. 2, 2012) (2:54:23 p.m. to 2:55:06); *id.* (Dec. 14, 2012) (12:06:39 p.m. to 12:07:09 a.m.); K.R.S. §§ 527.205(3) (use of a weapon of mass destruction in the second degree as a Class B felony), 507.020(2) (murder as a capital offense), 506.010(4)(b) (attempted capital offenses as Class B felonies), 532.020 (1)(c) (Class B felonies as carrying ten- to twenty-year terms of imprisonment). And, prior to setting that sentence, the trial judge did *not* purport to alter the permissible *range* of sentences pursuant to his own factfinding. *Cf. Alleyne*, 570 U.S. at 114 (noting that Sixth Amendment violations occur if the judge's factfinding purports to alter the sentencing range available "even if the defendant ultimately receive[s] a sentence falling within the original sentencing range"). That is, the judge's factfinding did not increase the minimum or maximum term of imprisonment.

Taken together, therefore, the trial judge's actions satisfied *Apprendi* and *Alleyne*. Before

the trial judge set Petitioner's sentence, he did not conduct factfinding that altered Petitioner's "punishment" by changing the permissible maximum or minimum sentence such that they differed from the maximum or minimum sentence authorized by the jury pursuant to the statutes of conviction. Accordingly, the trial judge's factfinding under Kentucky's violent offender statute—factfinding resulting in a delayed parole eligibility date, not a mandatory minimum sentence—did not implicate the Sixth Amendment's right to trial by jury.

To summarize in other words, once the trial judge set Petitioner's sentence within the range authorized by the jury pursuant to the statutes of conviction, and did so without finding facts that purported to increase the maximum or minimum term of conviction above and beyond that authorized by the statute of conviction, no *Apprendi* or *Alleyne* violation occurred and the Sixth Amendment's requirement that Petitioner receive a trial by jury was satisfied. Once the jury returned its verdict that Petitioner was guilty of two counts, each carrying terms of ten to twenty years' incarceration, Petitioner should have reasonably expected that he would serve ten to forty years in prison, depending on the length of his sentence as to each count and whether they would run concurrently or consecutively. *See Blakely v. Washington*, 542 U.S. 296, 308 (2004) ("In a system that says the judge may punish burglary with 10 to 40 years, every burglar knows he is risking 40 years in jail."). And, once the trial judge imposed a sentence of forty years, Petitioner should have reasonably expected that he would serve forty years in prison. Any early release pursuant to parole would be an "act of grace," not an entitlement. *See United States v. Haymond*, 588 U.S. 634, 643 (2019) (describing the award of parole as an "act of grace" (citations and quotation omitted)).

And importantly, while parole allows a defendant to be released from incarceration, it does not release him from his sentence. Indeed, a parole date does not set or alter a defendant's sentence,

but rather merely "replace[s] a portion of the defendant's prison term." *Id.* at 652. As such, a defendant released on parole will no longer serve the remainder of his sentence incarcerated, but he will serve out the remainder of the sentence on parole. In effect then, parole does not shorten a defendant's sentence; it only affects *how* the remainder of a sentence is served. Thus, when the trial judge's factfinding established that Petitioner must serve at least twenty years incarcerated before becoming eligible for parole on his forty-year sentence, he did not set a twenty-year mandatory minimum before allowing Petitioner to go free. Instead, he specified that out of the forty years for which Petitioner's liberty is deprived pursuant to the sentence authorized by the jury, Petitioner's liberty must be deprived *specifically through incarceration* for at least twenty of those years, and maybe more. In finding as such, the trial judge did not set a punishment that went beyond that authorized by the jury's verdict, and thus abided by the Sixth Amendment.

As already explained, this conclusion aligns with *Apprendi* and *Alleyne*'s explanations of the link between the crime and the punishment. As the *Apprendi* Court wrote, "[t]he judge's role in sentencing is constrained at its outer limits by the facts alleged in the indictment and found by the jury. Put simply, facts that expose a defendant to a punishment greater than that otherwise legally prescribed were by definition 'elements' of a separate legal offense" that must be found by a separate jury. 530 U.S. at 483 n.10. *Alleyne* specified that both "facts that increase the ceiling, but also those that increase the floor," are "elements" of an offense under *Apprendi*, since they "alter the prescribed range of sentences to which a defendant is exposed and do so in a manner that aggravates the punishment." 570 U.S. at 168. But here, the petitioner's parole eligibility date does not increase the floor or ceiling of the legally prescribed penalty range. Instead, Petitioner was sentenced within that range, and his parole eligibility date is the date at which he is eligible to potentially serve the remainder of that sentence on parole, rather than in prison.

Moreover, the *Apprendi* and *Alleyne* decisions, which constitute clearly established federal law in the habeas context, do not consider or discuss parole eligibility. While Petitioner nevertheless cites these decisions as grounds for concluding that an adjustment to one's parole eligibility date alters the legally prescribed penalty range and aggravates the penalty, that conclusion is not clearly supported by the rationale of *Apprendi* and *Alleyne*. In other words, to reach the same conclusion as Petitioner, the Court would be required to extend, rather than merely apply, the *Apprendi* and *Alleyne* rationale. This further demonstrates that Petitioner's position—i.e., that a fact affecting one's parole eligibility date must be found by a jury, rather than a judge—is not clearly established law. Indeed, the Supreme Court has explained that "[§] 2254(d)(1) provides a remedy for instances in which a state court unreasonably *applies* [Supreme Court] precedent; it does not require state courts to *extend* precedent or license federal courts to treat the failure to do so as error." *White*, 572 U.S. at 426. Thus, "'if a habeas court must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time of the state-court decision.'" *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004)).

True, § 2254(d)(1) does not require an "identical fact pattern before a legal rule must be applied." *Id.* at 427 (quoting *Patnetti v. Quarterman*, 551 U.S. 930, 953 (2007)) (internal quotation marks omitted). And "[c]ertain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt." *Id.* (quoting *Yarborough*, 541 U.S. at 666). This is not that case. Instead, there are reasonable arguments on both sides. Because "relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question," *id.* at 427 (quoting *Harrington v. Richter*,

562 U.S. 86, 103 (2011)), Petitioner's § 2254(d)(1) unreasonable application argument necessarily fails. *See id.* (explaining that the Supreme Court had not yet extended its earlier precedent to the facts at issue, "and there are reasonable arguments on both sides," and that is "all Kentucky needs to prevail in this AEDPA case").

For all of the reasons stated above, the Court concludes that the state court judge's "violent offender" finding did not violate Petitioner's constitutional rights as alleged in his petition. But that conclusion from this Court is not the heart of the inquiry under AEDPA. *See Harrington*, 562 U.S. at 98 (describing the burden of the habeas petitioner as "showing that there was no reasonable basis for the *state* court to deny relief" (emphasis added)). Rather, this Court asks whether the last-reasoned state court opinion in Petitioner's case—here, the Kentucky Supreme Court's opinion addressing Petitioner's direct appeal—appropriately considered the above clearly established federal law. *See Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991) (instructing federal courts to "look through" and defer to the "last reasoned state-court opinion" addressing a petitioner's ground for habeas relief); *Biederman*, 2022 WL 3007472, at *8, *8 n.15 (declining to address Petitioner's Sixth Amendment claim). As outlined above, § 2254(d) defines scenarios in which a state prisoner may obtain federal habeas relief as to a claim adjudicated on the merits in state court. Relevant here, the state court decision must be either "*contrary to* . . . clearly established Federal law, as determined by the Supreme Court of the United States," or it must have "*involved an unreasonable application of* . . . clearly established Federal law, as determined by the Supreme Court of the United States." *Williams*, 529 U.S. at 404–05. Under the "contrary to" category, the reviewing federal court may sidestep AEDPA deference if the state court "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "decides a case differently than [the Supreme Court] on a set of materially indistinguishable facts. *Id.* at 413. Under the "unreasonable

application" category, the application of Supreme Court precedent must be "objectively unreasonable," *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003), one "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *White v. Woodall*, 572 U.S. 415, 420 (2014).

In interpreting *Apprendi* and *Alleyne* as applied to Petitioner's case, the Kentucky Supreme Court found Petitioner's arguments "unpersuasive." *Biederman*, 434 S.W.3d at 46. The court first cited *Alleyne* as providing the legal standard, describing it as holding that "any fact which increases mandatory minimum sentences for a crime is an element of that crime, not a sentencing factor, and therefore must be submitted to the jury." *Id.* (citing *Alleyne*, 570 U.S.). Next, applying *Alleyne*'s holding to Petitioner's case, the court reasoned that although "the trial court's sentencing of [Petitioner] as a violent offender ensured he would serve a larger portion of the sentence in prison, it did not expose him to a larger punishment than authorized by the jury's guilty verdict." *Id.* (citing *Apprendi*, 530 U.S.). The court also distinguished between parole eligibility and increases in mandatory minimums, describing the issues as "wholly separate and apart" under *Alleyne*. *Id.* While the court recommended that the Commonwealth "avoid this issue in the future and put the question of finding serious physical injury before the jury," the Kentucky Supreme Court ultimately found no error in the trial judge's actions. *Id.*

Having considered the Kentucky Supreme Court's analysis, the Court finds its decision was neither "contrary to" nor an "unreasonable application" of clearly established federal law under § 2254(d)(1). First, as to the "contrary to" circumstance, the Court again cites to the standard provided by the United States Supreme Court in *Williams*. 529 U.S. at 406. There, the Supreme Court described state court decisions as "contrary to" clearly established federal law where they "appl[y] a rule that contradicts the governing law set forth in our cases" or "confront[] a set of

facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrive[] at a result different from our precedent." *Id.* at 405–06. Here, the Kentucky Supreme Court correctly stated *Alleyne*'s holding when it wrote that "any fact which increases mandatory minimum sentences for a crime is an element of that crime, not a sentencing factor, and therefore must be submitted to the jury." *Biederman*, 434 S.W.3d at 46; *see Alleyne*, 570 U.S. at 102. And, Petitioner's situation does not involve facts materially identical to *Alleyne*, a case in which the trial court's factfinding increased the mandatory minimum sentence but made no impact on (and required no discussion of) parole eligibility. 570 U.S. at 104. There is thus no legitimate argument that the Kentucky Supreme Court's decision was "contrary to" clearly established Supreme Court precedent according to *Williams*, as neither of the circumstances identified in *Williams* applies here. *See* 529 U.S. at 406–07.

As to the "unreasonable application" circumstance, the Kentucky Supreme court not only identified the correct standard, but also applied it reasonably. *Cf. Williams*, 529 U.S. at 407–08 ("A state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case certainly would qualify as a decision 'involv[ing] an unreasonable application of . . . clearly established federal law.'"). First, as discussed above, the Kentucky Supreme Court correctly identified *Alleyne*'s rule when it wrote that "any fact which increases mandatory minimum sentences for a crime is an element of that crime, not a sentencing factor, and therefore must be submitted to the jury." *Biederman*, 434 S.W.3d at 46; *see Alleyne*, 570 U.S. at 102. Second, the Kentucky Supreme Court reasonably applied this standard, finding Petitioner's arguments unpersuasive due to the distinction between mandatory minimums (which effect the "floor" of a sentencing range) and parole eligibility (which effects *how* a sentence is served), noting that Petitioner would merely "serve a larger portion of

the sentence *in prison*" without suffering "a larger punishment than that authorized by the jury's guilty verdict." *Biederman*, 434 S.W.3d at 46 (emphasis added). Indeed, to have ruled in Petitioner's favor on this issue would have required the state court to extend, rather than merely apply, the rationale in *Apprendi* and *Alleyne*. *See White*, 572 U.S. at 426 ("[I]f a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state court decision" (citation modified)). Petitioner's argument that the Kentucky Supreme Court's decision was an "unreasonable application" of *Alleyne* therefore fails.

As stated previously, § 2254(d) outlines the scenarios in which an application for a writ of habeas corpus by a state prisoner may be granted. See 28 U.S.C. § 2254(d). For all of the reasons just stated, the Court finds that this is not a scenario in which a state court decision was contrary to, or involved an unreasonably application of, clearly established federal law. *Id.* § 2254(d)(1). And while the statute also contemplates relief when the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2), Petitioner makes no such argument. Accordingly, Petitioner's Sixth Amendment claim fails.

In reaching this conclusion, the Court acknowledges that Petitioner's briefing makes several good points regarding the meaning of "punishment" under *Alleyne*; however, the Court must nevertheless reject Petitioner's requested habeas relief due to AEDPA's steep requirements. To be sure, though, the Court agrees with Petitioner that the practical effect of the trial judge's factfinding is that Petitioner will likely serve more time incarcerated than he would have absent that factual finding. Like the Kentucky Supreme Court, which expressed concern when analyzing the Sixth Amendment issue in this case, *see Biederman*, 434 S.W.3d at 46 ("[I]t would behoove

the Commonwealth to avoid this issue in the future and put the question of finding serious physical injury before the jury."), this Court also harbors concern that Kentucky's violent offender statute comes close to the constitutional line articulated in *Alleyne*. As the Court reviews in greater detail below, Justice Kitchens of the Mississippi Supreme Court shared similar concerns as conveyed in his dissent in *Fogleman v. Mississippi*, 283 So.3d 685 (Miss. 2019). But, for the reasons previously explained, including *Apprendi* and *Alleyne*'s discussions of permissible versus impermissible judicial factfinding, as well as the stringent AEDPA standard that forbids this Court from "extend[ing]" the Supreme Court's reasoning to apply it to the facts at hand, *see White*, 572 U.S. at 426, the Court cannot conclude that *Apprendi* and *Alleyne* are "clearly established" in a context where judicial factfinding does not impose a mandatory minimum, but instead delays a parole eligibility date.

The Court rests its decision solely on the above analysis of the holdings of *Apprendi* and *Alleyne* as applied to Petitioner's case by the Kentucky Supreme Court. However, the Court also finds reassurance in various other decisions, which the Court may consider "not as binding precedent, but rather to inform the analysis of Supreme Court holdings to determine whether a legal principle had been clearly established by the Supreme Court." *Foley v. Parker*, 488 F.3d 377, 382 (6th Cir. 2007); *Jones v. Bagley*, 696 F.3d 475, 482 n.1 (6th Cir. 2012) ("Courts look only to the holdings of the Supreme Court's decisions as of the time of the relevant state court decision . . . but consider lower-federal-court decisions to the extent they shed light on Supreme Court holdings."). Namely, in addition to the Supreme Court's decision in *United States v. Haymond*, 588 U.S. 634 (2019)—which was issued too late to be "clearly established federal law" in this matter—the Court also finds support in the Sixth Circuit's decision in *Robinson v. Woods*, 901

F.3d 710, 717 (6th Cir. 2018), and the Mississippi Supreme Court's ruling in *Fogleman v. State*, 283 So.3d 685 (Miss. 2019).

The Court first finds support for its conclusion in *Haymond*, a 2019 United States Supreme Court decision addressing the Sixth Amendment and judicial factfinding in the context of supervised release, wherein the Supreme Court also discussed parole. There, after a jury found the defendant guilty of possessing child pornography in violation of federal law, the applicable statute authorized the district judge to impose a prison term of zero to ten years, 18 U.S.C. § 2252(b)(2), as well as a period of supervised release of five years to life, § 3583(k). *See Haymond*, 588 U.S. at 637. The judge sentenced the defendant to a prison term of thirty-eight months to be followed by ten years of supervised release. *Id.* Then, during his supervised release term, the defendant was caught possessing child pornography, and the district judge therefore found that the defendant violated the terms of his supervised release. *Id.* Under 18 U.S.C. § 3583(e)(3), this finding (i.e., that the defendant violated the conditions of his release) authorized the district judge to incarcerate the defendant up to the maximum period of supervised release as authorized by the original statue of conviction—in that case, for up to two additional years in prison. *Id.* However, the specific finding that the defendant possessed child pornography implicated a different subsection of that statute. Section 3583(k) *required* the district judge to impose an additional five-year mandatory minimum prison term based solely on his finding by a preponderance of the evidence that the defendant had violated the terms of his supervised release by possessing child pornography. *Id.*

Justice Gorsuch, announcing the judgment of the Court and writing on behalf of four Justices, found § 3583(k) violated *Alleyne*. *Id.* at 645–46. As Justice Gorsuch explained, the original jury verdict authorized zero to ten years of incarceration under § 2252(b)(2), and § 3583(e)(3) permitted the judge to impose up to two years of incarceration for a supervised release

violation based on that original penalty range. *Id.* at 645. However, the judge's finding of a supervised release violation (specifically, the knowing possession of child pornography) based on a mere preponderance of the evidence under § 3583(k) "triggered a new punishment in the form of a prison term of at least five years and up to life," *id.* at 646, a prison term "well *beyond* that authorized by the jury's verdict," *id.* at 652 (emphasis in original). As such, § 3583(k) violated the Fifth and Sixth Amendments.

Justice Gorsuch's opinion affirms this Court's understanding of permissible versus impermissible judicial fact-finding, as discussed in *Apprendi* and *Alleyne*. To start, after reviewing the historical role of judges and juries, Justice Gorsuch explained that "[e]ven when judges did enjoy discretion to adjust a sentence based on judge-found aggravating or mitigating facts, they could not 'swell the penalty above what the law had provided for the acts charged' and found by the jury." *Id.* at 642 (quoting *Apprendi*, 530 U.S. at 519 (Thomas, J., concurring) (citation modified)). Important to the present case, in comparing and contrasting supervised release and parole, Justice Gorsuch also explained that parole is *part of* a defendant's sentence:

> In time, of course, legislatures adopted new laws allowing judges or parole boards to suspend part (parole) or all (probation) of a defendant's prescribed prison term and afford him a period of conditional liberty as an "act of grace," subject to revocation. . . . But here, too, **the prison sentence a judge or parole board could impose for a parole or probation violation normally could not exceed the remaining balance of the term of imprisonment already authorized by the jury's verdict. So even these developments did not usually implicate the historic concerns of the Fifth and Sixth Amendments**. *See Blakely*, 542 U.S. at 309, 124 S.Ct. 2531; *Apprendi*, 530 U.S. at 498, 120 S.Ct. 2348 (Scalia, J., concurring) . . . .

*Id.* at 643 (citations omitted). Phrased differently, and mapped onto the language of *Apprendi*, because parole merely establishes "certain rules *during* the balance of the sentence," *Morrissey v. Brewer*, 408 U.S. 471, 477 (1972), setting a parole eligibility date "set[s] a specific punishment *within* the bounds that the law has prescribed" through the jury's verdict, *Apprendi*, 530 U.S. at

519 (Thomas, J., concurring) (emphasis added). Reiterating this point elsewhere, Justice Gorsuch explained that where a defendant historically violated his parole or probation terms, "a judge generally could sentence the defendant to serve *only* the remaining prison term authorized by statute or his original crime of conviction," *Haymond*, 588 U.S. at 651 (emphasis in original) (citing *Morrissey*, 408 U.S. at 477), and thus "could not imprison a defendant for any longer than the jury's factual findings allowed," *id.*, describing this result as "entirely harmonious with the Fifth and Sixth Amendments," *id.* (citing *Apprendi*, 530 U.S. at 498 (Scalia, J., concurring); *Blakely*, 542 U.S. at 309). Parole—which is part of a defendant's original sentence or punishment as authorized by the jury—thus stands in contrast to supervised release, which sets a separate term of supervision "to encourage rehabilitation *after* the completion of [a defendant's] prison term." *Id.* at 652.

While *Haymond* did not directly address the precise issue before the Court in this case, Justice Gorsuch's opinion in *Haymond* bolsters this Court's reasoning. Because a parole term is merely part of the original sentence authorized by the jury pursuant to a conviction beyond a reasonable doubt, a delayed parole eligibility date does not set a mandatory minimum sentence, but instead specifies how the defendant may serve a given sentence. Justice Gorsuch agreed that it is "entirely harmonious" with the Sixth Amendment that where a judge finds a defendant violated parole by a preponderance of the evidence standard, the judge may require additional incarceration pursuant to that finding up to the maximum prison term authorized by the statute for the original crime of conviction. *See Haymond*, 588 U.S. at 651. The present facts, in which the judge made a factual finding by a preponderance of the evidence that meant Petitioner must serve a greater proportion of his sentence incarcerated rather than on parole, are functionally identical and no less harmonious with the Sixth Amendment. Because the district judge in Petitioner's case did not

purport to "imprison [Petitioner] for any longer than the jury's factual findings allowed," no Sixth Amendment issue arises here. *See id.* (citations omitted). The Court thus reads *Haymond* as supporting its prior analysis of *Apprendi* and *Alleyne*.

The Court next considers *Robinson* in light of its extensive discussion in the RD and in Petitioner's briefing. There, Michigan's sentencing scheme was indeterminate, meaning the judge established a minimum and maximum term of imprisonment for each offense, with the actual time served left to the determination of Michigan's parole board. 901 F.3d at 712–13, 716–17. The scheme used a formula to assist judges in setting the minimum term of imprisonment. *Id.* at 713. The formula considered both judge-found facts and the elements of the offense for which the defendant was convicted and produced a range of recommended minimum sentences, from which the judge picked one. *Id.* at 713, 717. Once set, that minimum sentence was mandatory, and also served as the defendant's parole eligibility date. *Id.* Taken together and in summary, under Michigan's scheme, judge-found facts incorporated in the formula could increase the range of permissible mandatory minimum sentences, from which the judge at sentencing then chose a mandatory minimum sentence that also served as the defendant's parole eligibility date. *Id.* at 712–13, 716–17. So, judge-found facts could *both* increase the mandatory minimum sentence *and* push back the defendant's parole eligibility date. *Id.* In its *Robinson* decision, the Sixth Circuit determined that "*Alleyne* proscribed exactly that which occurred at petitioner's sentencing hearing—the use of '[f]acts that increase the mandatory minimum sentence' that were never submitted to the jury and found beyond a reasonable doubt." *Id.* at 717 (citing *Alleyne*, 570 U.S. at 108).

Petitioner here argues—and the Court understands the RD to recommend—that because Michigan's sentencing scheme violated *Alleyne*, this Court should find the same for Kentucky's

scheme as applied to Petitioner, since Kentucky's scheme also permitted the trial judge in his case to conduct factfinding that pushed back his parole eligibility date. *See* [R. 20, pp. 14–16]; [R. 26, p. 5]. But Petitioner's argument overlooks a key distinction that made Michigan's scheme unconstitutional, yet keeps Kentucky's scheme constitutional as applied to him: under Michigan's scheme, judicial factfinding could produce an aggravated *minimum sentence* (i.e., one above and beyond that authorized by the jury pursuant to the statute of conviction)—the precise concern in *Alleyne*—whereas the judicial factfinding in Kentucky's scheme does not. In other words, the Michigan scheme permitted factfinding that divorced the range of minimum sentences available for the judge to impose at sentencing from the minimum sentence authorized by the statute of conviction, while Kentucky's scheme requires the judge to impose a sentence within the range authorized by the jury's verdict.

A specific comparison of the facts in *Robinson* and the facts of Petitioner's case may prove helpful. In *Robinson*, "[t]he parties agree[d], and the [Presentence Investigation Report] reflect[ed], that the sentencing court scored multiple variables that went beyond the mere elements of the offenses for which Robinson was convicted, . . . which resulted in higher minimum-sentence ranges than would have been warranted without the judge-found facts." 901 F.3d at 713. This meant that when the sentencing judge "reviewed and accepted the [Presentence Investigation Report's] recommended scores for the guideline variables" before handing down Robinson's sentence, *id.*, the judge's factfinding artificially limited his own sentencing discretion by restricting his "choices within the authorized range" of sentences established by the jury's conviction. *Alleyne*, 570 U.S. at 107. Specifically, the judge's factfinding meant that the judge selected Robinson's minimum sentences from ranges of 84–175 months instead of the 36–75 months authorized by the jury's verdict (Count I – Extortion), 19–38 months instead of the 0–17 months

authorized by the jury's verdict (Count II – Delivery of a Controlled Substance), and 50–125 months instead of the 12–30 months authorized by the jury's verdict (Count III – Unlawful Imprisonment). *See id.* at 713; Brief for Petitioner-Appellant at 26, 42, 45, *Robinson v. Woods*, No. 16-2067 (6th Cir. Mar. 14, 2018), Dkt. No. 32 [hereinafter *Robinson* App. Brief]. This alone was sufficient to constitute a clear *Alleyne* violation. *See Alleyne*, 570 U.S. at 115 (indicating that judicial factfinding may "violate the Sixth Amendment, even if the defendant ultimately received a sentence falling within the original sentencing range"). But the fact that the minimum sentence actually imposed—308 months—was *higher than* the greatest minimum sentence authorized by the jury's verdict—217 months—makes the constitutional issues with Robinson's sentence all the more clear, *see Robinson*, 901 F.3d at 713; *Robinson* App. Brief at 26, 42, 45.

By contrast, in Petitioner's case, the judge's factfinding had no impact on the range of available sentences for Petitioner's offenses. At Petitioner's trial, the jury's two convictions for Class B felonies authorized a verdict of ten to forty years, *see* Recording of Proceedings, *Commonwealth v. Biederman*, No. 12-CR-28 (Boyd Circuit Ct. Nov. 2, 2012) (2:12:58 p.m. to 2:13:26 p.m.) (on file with the Kentucky Office of the Attorney General); the jury recommended a sentence of twenty years for each count to run consecutively for a total of forty years, *see id.* (Nov. 2, 2012) (02:54:23 p.m. to 02:55:06 p.m.), and the judge imposed a sentence of forty years, *id.* (Dec. 14, 2012) (12:06:50 p.m. to 12:07:09 p.m.). The judge's *subsequent* factfinding, which effectively required Petitioner to serve a greater portion of his sentence in prison rather than out on parole, did *not* purport to alter the range of punishments available to the judge.

Moreover, the *Robinson* court itself highlighted the distinction between sentencing, where the Sixth Amendment applies, and parole. The *Robinson* court specifically noted that under its facts, the Sixth Amendment violation arose out of the increase in the petitioner's minimum

sentence, *not* the delay of the petitioner's parole eligibility date. *See* 901 F.3d at 718. In stating as such, the Sixth Circuit was addressing the respondent's argument that Michigan's sentencing scheme did not implicate *Alleyne* because there is no constitutional right to parole. This argument relied on the fact that the sentences imposed under Michigan's scheme were "indeterminate," meaning that "the sentencing judge set[] the minimum sentence using judge-found facts to score a number of [variables], while the criminal statute for the particular offense set[] the maximum sentence." *Robinson*, 901 F.3d at 717. Under the scheme, therefore, criminal defendants "[did] not know how long they will serve in prison, because, between the minimum sentence and the statutory maximum sentence, prisoners [were] subject to the jurisdiction of the parole board and have no [constitutional] right to parole." *Id.* From these facts, the respondent argued that *Alleyne* was irrelevant to Michigan's scheme "because the minimum sentence in Michigan criminal practice [was] nothing more than a parole-eligibility date, and the Supreme Court has maintained that there is no constitutional right to parole." *Id.* (citing *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979)). In other words, the *Robinson* respondent claimed that because parole became available once the minimum sentence was served and because there is no constitutional right to parole, there was no Sixth Amendment issue with judicial fact-finding that increased the minimum sentence.

The Sixth Circuit dispensed with this argument by distinguishing between the constitutional rights at issue: the right to parole, which the Constitution does not provide, and the right to a trial by jury, which the Sixth Amendment protects. The Court explained,

> While an increase in a Michigan minimum sentence may delay only the date on which a defendant becomes eligible for parole, **the lack of a constitutional right to parole is wholly unrelated to the right to have a jury find the facts that "alter the prescribed range of sentences to which a defendant is exposed**." *Alleyne*, 570 U.S. at 108, 133 S.Ct. 2151. **This right arises at sentencing, well before parole (or the denial thereof) comes into play. And that is the right addressed**

> **in the *Apprendi* and *Alleyne* line of cases.** *See, e.g.*, *id.* Accordingly, *Alleyne* requires us to hold that the Michigan trial court's use of judge-found facts to score mandatory sentencing guidelines that resulted in an increase of petitioner's minimum sentence violated petitioner's Sixth Amendment rights. *Id.*

901 F.3d at 718 (emphasis added). In other words, the *Robinson* court correctly identified that the Sixth Amendment issue in that case was the increased mandatory minimum sentence as a result of judicial factfinding, *not* the resultant delayed parole eligibility date resulting from the judicial factfinding, despite the Michigan law linking a defendant's parole eligibility date with his or her minimum sentence. Because the factfinding under Kentucky's violent offender statute differs from that under Michigan's sentencing scheme in that the judge-found facts affect *only* the defendant's parole eligibility date and does not change the sentencing range by imposing a mandatory minimum, *Robinson* is distinguishable from the present facts.

Another court's consideration of similar issues further reassures this Court. In *Fogleman v. State*, the Mississippi Supreme Court addressed the constitutionality of a Mississippi statute similar to Kentucky's violent offender law, and found it satisfied *Alleyne*. 283 So.3d at 692. There, because Fogleman was convicted of felony failure to stop a motor vehicle for law enforcement, the jury's verdict authorized a sentence of zero to five years in prison pursuant to the applicable statute. *Id.* at 687; *see* Miss. Code Ann. § 97-9-72(2) (Rev. 2014). Then, after the jury was dismissed, the State sought to classify Fogleman's crime as a crime of violence, which would require Fogleman to serve at least fifty percent of his sentence before becoming eligible for parole. 283 So.3d at 688; *see* Miss. Code An. § 97-3-2(2) (Rev. 2014). At sentencing, the trial judge imposed a five-year sentence and additionally found Fogleman had committed a crime of violence. 283 So.3d at 688. On appeal, Fogleman claimed—and the state court of appeals found—that § 97-3-2(2) violated the Sixth Amendment by permitting a judge, rather than a jury, to find a fact that increases the mandatory minimum amount of time a convict must serve incarcerated. *See*

*Fogleman v. State*, 276 So.3d 1213, 1215–17 (Miss. Ct. App. Sep. 18, 2018). In reversing the lower court, the Mississippi Supreme Court provided the following persuasive analysis:

> [A]**pplying *Alleyne* to any judicial finding that impacts parole eligibility stretches the Supreme Court's decision beyond its actual holding**. As discussed, the Supreme Court said in *Alleyne* that facts impacting a defendant's sentence must be submitted to the jury and found beyond a reasonable doubt. The Court did not mandate how much time a defendant must actually serve, nor did it snuff out judicial discretion in sentencing within statutory parameters. In *Alleyne*, the majority recognized these issues. It emphasized that "facts that increase a mandatory minimum sentence must be submitted to the jury," but it cautioned that the court's ruling did "not mean that any fact that influences judicial discretion must be found by a jury." [footnote omitted] *Alleyne*, 570 U.S. at 116, 133 S.Ct. 2151 (emphasis added).

*Fogleman*, 283 So.3d at 690 (emphasis added). As a result, the Mississippi Supreme Court concluded that § 97-3-2(2) did not violate *Alleyne*, since the statute "only impacted Fogleman's actual time to serve [incarcerated] and not his sentence" and the judicial factfinding "in no way altered that statutory sentence or kicked in any mandatory minimum." *Id.* at 691. Because the facts of *Fogleman* are remarkably similar to ours, the Court finds the Mississippi Supreme Court's analysis persuasive.

Although the Court ultimately agrees with the *Fogleman* majority, the Court also notes Justice Kitchen's dissent, which the Court finds to be enumerative as to its own concerns with Kentucky's statutory scheme. Justice Kitchen reasoned that because "[t]he postponement of the date on which a convict will be eligible for parole or early release is punitive," such a postponement "unquestionably serves as additional punishment for the convict, who must serve the time until that date, 'day for day,' in prison with no possibility of early release or parole." *Id.* at 695. Moreover, Justice Kitchen argued that there is a "meaningful difference" in the punitiveness of a sentence with parole eligibility and one without the possibility of parole, even if a parole board may deny parole to any eligible prisoner. *Id.* Justice Kitchen pointed out that the United States

Supreme Court itself recognized the increased punitiveness of sentences imposed without the possibility of parole, when it ruled in the Eighth Amendment context that juvenile offenders could not be sentenced to life in prison without the possibility of parole. *Id.* (citing *Miller v. Alabama*, 567 U.S. 460, 479 (2012)). To Justice Kitchen, the same reasoning applies regarding an aggravated mandatory minimum sentence and a delayed parole eligibility date; even if a delayed parole eligibility date is not necessarily exactly the same as a mandatory minimum, both of those components of a sentence affect the sentence's punitiveness, which Justice Kitchen argues was the core reasoning underlying *Alleyne*. *See id.* n.8 (citing *Alleyne*, 570 U.S. at 113).

The Court harbors some of the same concerns as Justice Kitchen. The Court agrees that judicial factfinding that delays a defendant's parole eligibility date, as occurred in *Fogleman* and here, increases the punitiveness of that defendant's sentence. In light of this, the Court echoes the Kentucky Supreme Court in advising that "it would behoove the Commonwealth to avoid this issue in the future" by putting questions impacting a defendant's parole eligibility date before a jury. *See Biederman*, 434 S.W.3d at 46. Nevertheless, in light of the Court's prior analysis of *Apprendi* and *Alleyne*, taken together with the steep standards imposed by AEDPA, the Court cannot award Petitioner's requested relief. To do so would be to extend *Alleyne* beyond the context in which it was handed down (i.e., mandatory minimums) to cover a new context (i.e., parole eligibility) in which the *Alleyne* Court made no comment at the time of that decision.

Considering *Haymond*, *Robinson*, and *Fogleman*, the Court finds reassurance that its prior analysis of *Apprendi* and *Alleyne* as sources of "clearly established Federal law" remains accurate as applied to Petitioner's case. Taken together, in light of the objections raised to the RD and the applicable caselaw, the Court has reviewed de novo the RD's conclusion that Petitioner is entitled to habeas relief for a violation of his Sixth Amendment right to a jury trial. The Court rejects the

RD's conclusion and determines instead that Petitioner is not entitled to habeas relief as to his Ground Two claim.

*c. Harmless Error*

Because the RD concluded that Petitioner's Sixth Amendment right to a jury trial was violated, the RD conducted a harmless error analysis. *See* [R. 20, pp. 22–40]. Although the RD first determined that Respondent waived any harmless error defense and that such a waiver should be credited, the RD nevertheless conducted a full harmless error analysis. *See id.* Pursuant to that analysis, the RD established that the trial error was not harmless and thus recommended that this Court grant Petitioner's requested habeas relief as to Ground Two. *See id.* at 24–40]. Respondent objects to this portion of the RD, arguing that Petitioner cannot establish the harmfulness of the trial judge's supposed error. *See* [R. 21, pp. 8–10].

Despite the RD's extensive analysis of harmless error and Respondent's objection thereto, because this Court concludes that no trial error occurred implicating Petitioner's Sixth Amendment rights, the Court need not conduct any harmless error analysis.

**B. Ground Four: Sufficiency of the Evidence**

The Supreme Court has held "that the Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" *Jackson v. Virginia*, 443 U.S. 307, 315 (1979) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). Thus, if there is insufficient evidence to permit a rational trier of fact to find guilt beyond a reasonable doubt, that conviction must be set aside. *Id.* at 316.

In the present case, Petitioner's fourth ground for relief alleges that the evidence presented at trial was insufficient to support his convictions, since the prosecution presented "no evidence

[P]etitioner planted a bomb in the [victim's] car" and "no evidence [P]etitioner had any connection to the bomb." [R. 1, pp. 7–8]. Petitioner argues that because the prosecution's evidence failed to "directly link[] [P]etitioner to the act" and instead required the jury to make "inferences" as to his guilt, his conviction cannot be upheld. *Id.*

The RD treats Petitioner's Ground Four claim as a "*Jackson* insufficient-evidence claim." [R. 20, p. 41]. As noted, *Jackson v. Virginia* requires a defendant's conviction to be set aside where there is insufficient evidence to permit a rational trier of fact to find the defendant's guilt beyond a reasonable doubt. 443 U.S. at 316 (citing *In re Winship*, 397 U.S. at 364). A court's review must consider "*all of the evidence*" available in the record. *Id.* at 319 (emphasis in original). Evidence in the record is sufficient to support a finding of guilt beyond a reasonable doubt where, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (emphasis in original). Even if a jury's verdict in a particular case was actually reached irrationally, the inquiry is nevertheless whether any hypothetical rational factfinder could have found the defendant guilty beyond a reasonable doubt. *See id.* at 319 n.13 ("[T]he standard announced today does not permit a court to make its own subjective determination of guilt or innocence, [and] it does not require scrutiny of the reasoning process actually used by the factfinder—if known."). For a federal habeas court's review, where "a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326.

Before reaching the merits of Petitioner's claim, the RD reached a similar conclusion regarding Petitioner's procedural default as it did in Ground Two, *see supra* Section III(A)(4)(b), determining that "[i]t appears this [Ground Four] claim was procedurally defaulted, but

[Respondent] has waived any procedural-default defense by addressing the claims raised by [Petitioner's] petition only on the merits." *Id.* at 41–42. Because Respondent purportedly waived any procedural default defense, the RD reviewed Petitioner's claim de novo. *Id.* at 42.

Then, to determine the merits of Petitioner's *Jackson* claim, the RD took note of the elements of the two crimes for which Petitioner was convicted—attempted murder[10] and use of a weapon of mass destruction in the second degree.[11] [R. 20, p. 43]. The RD then reviewed the evidence presented at trial and assessed whether it met the *Jackson* test, such that "*any* rational finder of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319 (emphasis in original). The evidence presented at trial included the following: Petitioner had access to the victim's car and he and the victim had a $300,000 life insurance policy, [R. 19, pp. 9, 11]; Petitioner and the victim "were in dire financial straits" and "fac[ed] foreclosure on their house," Recording of Proceedings, *Commonwealth v. Biederman*, No. 12-CR-28 (Boyd Circuit Ct. Nov. 1, 2012) (10:17:59 a.m. to 10:18:25 a.m.); Petitioner and the victim's family computer had incriminating search history on how to build a bomb, *id.* (Oct. 26, 2012) (03:23:38 p.m. to 03:24:51 p.m.); Petitioner had the opportunity to build, place, and arm the bomb, *id.* (Oct. 29, 2012) (09:30:20 a.m. to 09:31:47 a.m.); and the makeup of the bomb indicated intent to cause

---

[10] A defendant is guilty of attempt under Kentucky law when they act with the level of "culpability otherwise required for the commission of the crime" and "intentionally does or omits to do anything which, under the circumstances as he believes them to be, is a substantial step in a course of conduct planned to culminate in his commission of the crime." Ky. Rev. Stat. § 506.010. And, a defendant is guilty of murder under Kentucky law when they, "with intent to cause the death of another person, . . . causes the death of such person or of a third person." Ky. Rev. Stat. § 507.020(1)(a).

[11] Under the theory the Commonwealth pursued at trial, proving a defendant's use of a weapon of mass destruction in the second degree requires proving the defendant "intentionally, without lawful authority," placed "a weapon of mass destruction at any location in the Commonwealth and, as a result, any person other than the defendant [received] physical injury." Ky. Rev. Stat. § 527.205(1)(a). A "weapon of mass destruction" includes "any destructive device as defined in K.R.S. § 237.030," and a "[d]estructive device' means any explosive, incendiary, or poison gas bomb, grenade, mine, rocket, missile, or similar device and includes the unassembled components from which such a device can be made." K.R.S. § 237.030(1).

injury or death. *Id.* (Oct. 29, 2012) (09:31:57 a.m. to 09:32:12 a.m.). Considering this evidence, the RD concluded that the evidence presented at trial was sufficient for a rational jury to find beyond a reasonable doubt that Petitioner was guilty of both second-degree use of a weapon of mass destruction and attempted murder. [R. 20, p. 45]. Finally, the RD noted that Petitioner disagrees with its conclusion, since "[i]n his view, the Commonwealth's failure to establish 'that other people could not have committed the crime' means that he could not constitutionally be convicted." *Id.* at 46 (quoting [R. 19, p. 5]). In response, the RD points out that the Supreme Court in *Jackson* declined to impose an "affirmative duty" on the prosecution "to rule out ever hypothesis except that of guilt beyond a reasonable doubt." *See id.* (quoting 433 U.S. at 326). Accordingly, the RD rejected Petitioner's argument and determined that Petitioner was not entitled to habeas relief for Ground Four. *See id.*

Petitioner advances two objections to the RD's conclusions as to Ground Four. First, Petitioner argues that he did not procedurally default "because the Kentucky Supreme Court failed to 'actually enforce' its waiver rule." [R. 22, p.7]. In Petitioner's view, the Kentucky Supreme Court's lack of enforcement can be seen through three statements by the Court: (1) the "dicta" that Petitioner's claim "was unpreserved and reviewed for palpable error"; (2) the subsequent disclaimer of its standard of review by holding that Petitioner's arguments were unpersuasive "regardless of the varying standards of review"; and (3) the ensuing analysis of all of Petitioner's *Jackson* claims "together on the merits under the same standard of review." *Id.* at 8 (quotations omitted). Therefore, according to Petitioner, "the Kentucky Supreme Court did not actually enforce its palpable error procedural rule" and instead "lumped the unpreserved claims of error in with the preserved claim and reviewed them all on the merits," meaning "there is no procedural default." *Id.* at 8–9. In the alternative, Petitioner suggests that the RD was correct in its

recommendation that Respondent waived any procedural default defense as to this claim by proceeding immediately to the merits of Petitioner's claims in his Answer. *See id.* at 9.

Because the RD correctly determined that Petitioner procedurally defaulted, Petitioner's first objection is meritless. The case *Hinkle v. Randle*, 271 F.3d 239 (6th Cir. 2001), which the RD cites and Petitioner does not address, is persuasive to this Court. According to *Hinkle*, the Sixth Circuit "view[s] a state appellate court's review for plain error as the enforcement of a procedural default." 271 F.3d at 244 (citing *Seymour v. Walker,* 224 F.3d 542, 557 (6th Cir.2000)). And, importantly, the Kentucky Supreme Court has stated that "[t]he federal courts' standard for plain error review is comparable to Kentucky's standard of review for palpable error." *Baldwin v. Commonwealth*, 723 S.W.3d 676, 694 n.16 (Ky. 2025). In addition to this express statement as to the similarity between the two standards, the Kentucky Supreme Court has described palpable errors as those that are "easily perceptible, *plain*, obvious and readily noticeable." *Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006). Taken together, because the Kentucky Supreme Court reviewed Petitioner's claim under a palpable error standard and because palpable error is effectively the same as plain error, the Kentucky Supreme Court *did* enforce its procedural rule in addressing Petitioner's appeal. Petitioner therefore procedurally defaulted as to his Ground Four claim. Regardless, the Kentucky Supreme Court nevertheless considered the merits of Petitioner's claim. *See* 434 S.W.3d at 47–48. Accordingly, this Court's review of Petitioner's claim is not barred. *See Harris v. Reed*, 489 U.S. 255, 263 (1989) ("[A] procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar." (citation modified)).

The Court therefore turns to Petitioner's merits-based objection to the RD. Petitioner

claims the evidence was, in fact, insufficient to support a finding that Petitioner was guilty of both offenses, meaning the Kentucky Supreme Court's opposite conclusion during his appeal was "contrary to and an unreasonable application of the clearly established *Jackson* sufficiency-of-the-evidence framework." [R. 22, pp. 9–10]. Petitioner claims that numerous facts about his case support the jury's guilty verdict "only by the extreme stacking of unsupported inferences"—not enough to meet the *Jackson* standard. *Id.* at 10; *see id.* at 10–13. As merely one example, Petitioner argues that his access to the victim's car only "weakly shows access and opportunity" to commit the crime and "does not support a reasonable inference that he is guilty." *Id.* at 11. In addition to this argument and others, all of which attempt to distance Petitioner from the crime, Petitioner claims that "there was no direct evidence" that he planted the bomb, meaning "[n]o rational jury could have found guilt from th[e] weak and limited circumstantial evidence" that was actually presented at trial. *Id.* at 13–14.

Because the Kentucky Supreme Court's ruling was not "contrary to" or an "unreasonable application of" clearly established federal law, Petitioner's second objection is also meritless. § 2254(d)(1).

First, as to the "contrary to" circumstance, *Williams* provides the standard: state court decisions are "contrary to" clearly established federal law where they "appl[y] a rule that contradicts the governing law set forth in our cases" or "confront[] a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrive[] at a result different from our precedent." 529 U.S at 405–06. Here, the Kentucky Supreme Court correctly stated *Jackson*'s standard when it wrote that evidence is insufficient to support a verdict only "if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt," after "tak[ing] the evidence in the light most favorable to the opposing party." *Biederman*, 434 S.W.3d

at 47. And, the record in Petitioner's case does not demand a result different from that in *Jackson*, a case in which the circumstantial evidence at issue was likewise found sufficient to uphold the defendant's conviction. 443 U.S. at 324–25. Thus, the Kentucky Supreme Court's decision was not "contrary to" clearly established Supreme Court precedent according to *Williams*, as neither of the circumstances identified in *Williams* applies here. *See* 529 U.S. at 406–07.

Next, as to the "unreasonable application" circumstance, the Kentucky Supreme Court—the last-reasoned state court decision—not only identified the correct standard, but also applied it reasonably. *See Williams*, 529 U.S. at 407–08 ("A state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case certainly would qualify as a decision 'involv[ing] an unreasonable application of . . . clearly established federal law.'"); *Ylst*, 501 U.S. at 804. First, the Kentucky Supreme Court correctly identified *Jackson*'s sufficiency-of-the-evidence standard when it wrote that evidence is insufficient to support a verdict only "if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt," after "tak[ing] the evidence in the light most favorable to the opposing party," here, the prosecution. *Biederman*, 434 S.W.3d at 47. Second, the Kentucky Supreme Court reasonably applied this standard, concluding that "[w]hile none of th[e] evidence [presented] alone stands as dispositive, taking the Commonwealth's evidence as true and drawing all inferences in favor of the Commonwealth," there was sufficient evidence to uphold Petitioner's convictions. *Id.* at 48. The Kentucky Supreme Court specifically found "sufficient evidence to show that this pipe bomb was a weapon of mass destruction; that it was capable of causing death; that Biederman placed it in Riggs's car; that Riggs was injured; and that Biederman intended to kill Riggs with it"—the elements of the offenses for which Petitioner was convicted. *Id.* Accordingly, because the Kentucky Supreme Court concluded that "it would not have been clearly unreasonable for a jury

to find [Petitioner] guilty under these circumstances," *id.*, its decision was not "objectively unreasonable," *Lockyer*, 538 U.S. at 75, or "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *White*, 572 U.S. at 420.

The Court therefore concludes that Kentucky Supreme Court's decision was not contrary to clearly established federal law, nor did it involve an unreasonable application of such law. 28 U.S.C. § 2254(d)(1). And Petitioner does not appear to argue that the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" under § 2254(d)(2). As such, Petitioner's *Jackson* claim fails.

**C. Ground Six: Ineffective Assistance of Counsel**

Petitioner's sixth ground for relief alleges that his trial counsel provided ineffective assistance of counsel (hereinafter, "IAC") in several ways, thereby violating his constitutional right to counsel. *See* [R. 1, p. 10]; [R. 19, pp. 11–15]; *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (explaining that the constitutional "right to counsel is the right to effective assistance of counsel" (quoting *McMann v. Richardson*, 97 U.S. 759, 771 n.14 (1970))). First, Petitioner alleges IAC because his counsel failed to call or consult three expert witnesses: a medical expert to create doubt about the extent of the victim's injuries; a computer expert to rebut testimony from the Commonwealth's expert regarding computer searches about making bombs that were found on the family computer; and an explosives expert who could have exposed flaws in the prosecution expert's conclusions. *See* [R. 1, p. 10]; [R. 19, pp. 3–4, 11–12]. Second, Petitioner alleges IAC because his counsel failed to call fact witnesses who would have testified that Petitioner was not seen in the parking garage where the bomb was allegedly armed and detonated. [R. 1, p. 10]. Third, Petitioner alleges IAC because his counsel failed to make various evidentiary objections based on

lines of questioning conducted at trial. [R. 19, pp. 12–14]. Fourth and lastly, Petitioner alleges IAC because his counsel failed to object to the trial venue. [R. 19, pp. 14–15].

The RD concluded that none of Petitioner's IAC claims were meritorious. *See* [R. 20, pp. 46–53]. In Petitioner's objections to the RD, however, Petitioner only objects to the RD's conclusion regarding Petitioner's IAC claim for his counsel's failure to call an explosives expert. *See* [R. 22, pp. 14–20]. As previously noted, *see supra* Section II, this Court need only conduct a de novo review "of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). And it need not conduct de novo review of general objections that fail to identify specific factual or legal issues, because it duplicates the Magistrate Judge's efforts and wastes judicial economy. *Howard*, 932 F.2d at 509. Ultimately, this Court has reviewed the RD's conclusions as to each of Petitioner's IAC claims and agrees that none are meritorious. However, due to the considerations outlined by the Sixth Circuit in *Howard*, the Court below will only conduct a de novo review of the RD's conclusion regarding the IAC claim for which Petitioner filed an objection: his counsel's failure to call or consult with an explosives expert. In other words, the Court concludes based on its review of the record and the RD that no IAC occurred as a result of Petitioner's counsel's (1) failure to call a computer expert, a medical expert, or fact witnesses; (2) failure to make evidentiary objections at trial; or (3) failure to object to the trial venue. But, in light of Petitioner's objection to the RD's conclusion that Petitioner's counsel's failure to call or consult with a bomb expert was not IAC, the Court will conduct a de novo review of that portion of the RD in light of the controlling facts and law.

To show that IAC occurred, a defendant must prove both deficient performance and prejudice. *Strickland*, 466 U.S. at 687. As to the first prong, a defendant establishes deficient performance by showing "that counsel's representation fell below an objective standard of

reasonableness" as measured under "prevailing professional norms" and evaluated "considering all the circumstances." *Id.* at 688. In evaluating deficient performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (internal quotations omitted). As to the second prong, a defendant establishes prejudice by showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Courts consider the "totality of the evidence" when assessing prejudice. *Id.* at 695. Even if an error by counsel is "professionally unreasonable," a criminal judgment should not be set aside "if the error had no effect on the judgment." *Id.* at 691. When conducting a *Strickland* analysis, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies," and indeed, need not "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

Where a habeas petitioner makes an IAC claim, there is an interaction between § 2254(d)'s "unreasonable application" prong, *see supra* Section III(A)(1)(B), and the *Strickland* test. "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Harrington*, 562 at 101. Section 2254 requires that a state court "be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id.* Accordingly, because both § 2254 and *Strickland* are each already "highly deferential, . . . when the two apply in tandem, review is doubly deferential." *Id.* at 105 (citations and quotations omitted). Taken together, "[w]hen § 2254(d) applies, the question is not

whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

The RD assessed Petitioner's IAC argument regarding an explosives expert using the standard outlined above. Petitioner primarily argues that if his counsel had called an explosives expert, the expert could have "exposed flaws in the prosecution expert's conclusion that installing the bomb would be time intensive." [R. 20, p. 51 (citing [R. 19, pp. 3–4; 11–12])]. The RD, discussing the conduct of Petitioner's counsel at trial, notes various actions and inquiries that *were* conducted by defense counsel. *See id.* at 51–52. For example, during cross-examination of the prosecution's expert witness, defense counsel "inquired into the validity of the reasons given by [the witness] for his conclusion that placing the bomb would be a time-consuming process," and "got [the witness] to admit that laying the wires for the bomb could be done quickly," the combination of which led the RD to find that "the defense did press the issue of how long it would take to construct and install the bomb." *Id.* Defense counsel also suggested "several alternative perpetrators who could have installed the bomb." *Id.* However, the RD also noted that "[s]tate post-conviction proceedings revealed that defense counsel was not savvy about bombs; he mistakenly believed they all functioned the same way." *Id.* From this, the RD determined that defense counsel arguably had a duty to consult with an explosives expert, and that the failure to do so constituted deficient performance under *Strickland*. *Id.* But, crucially, because Petitioner "offered no evidence in state court that he was prejudiced by this deficient performance" and "it is the petitioner's burden to establish prejudice," the RD concluded that Petitioner's IAC claim regarding the explosives expert was meritless.

In response to the RD, Petitioner objects that, in light of his counsel's trial strategy, "[t]he Kentucky Court of Appeals unreasonably applied clearly established Federal law as determined

by the Supreme Court in rejecting [Petitioner's] claim of ineffective assistance of counsel for failure to consult with and hire a bomb expert to testify." [R. 22, p. 17]. Because Petitioner's counsel's trial strategy attempted to persuade the jury that Petitioner did not plant the bomb that harmed the victim, Petitioner argues a bomb expert would have helped "challenge the assertions of the Commonwealth's witnesses." *Id.* Petitioner argues he can establish this failure both constituted deficient performance and prejudiced him under *Strickland*. Regarding deficient performance, Petitioner argues his trial counsel should have retained an expert to supplement his own lack of knowledge about bombs, especially in light of the importance of explosives-related issues at trial. *See* [R. 22, p. 18]. And, regarding prejudice, Petitioner admitted that he "did not present any evidence to the state court at any stage about testimony from an expert witness on bombs," but nevertheless argues such prejudice was "obvious," since a bomb expert would have testified that Petitioner's familiarity with bombs and bombmaking meant he "would have known to use a more powerful explosive had he intended to kill his wife." *Id.* at 19–20. Accordingly, Petitioner claims he is entitled to relief as to his IAC claim.

As discussed, the RD concluded that Petitioner's IAC claim lacked merit because Petitioner failed to establish that he was prejudiced by any deficient performance. *See* [R. 20, pp. 51–52]. For the reasons that follow, this Court agrees Petitioner's claim is meritless.

Petitioner's objection to the state court's deficient-performance decision entirely appears to be on § 2254(d)(1) grounds, as he argues "the Kentucky Court of Appeals unreasonably applied clearly established Federal law." [R. 22, p. 17]. But here, the Kentucky Court of Appeals—the last-reasoned state court decision—not only identified the correct standard, but also applied it reasonably. *See Williams*, 529 U.S. at 407–08 ("A state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case certainly

would qualify as a decision 'involv[ing] an unreasonable application of . . . clearly established federal law.'"); *Ylst*, 501 U.S. at 804. First, the Kentucky Court of Appeals correctly identified *Strickland*'s deficient-performance standard when it wrote that "deficiency [] is established by analyzing whether the alleged acts or omissions were outside the prevailing professional norms based on an objective standard of reasonableness," then further explained that this standard is highly deferential. *Biederman*, 2022 WL 3007472, at *4; *see Strickland*, 466 U.S. at 688–89. Second, the Kentucky Court of Appeals reasonably applied this standard. In finding that Petitioner's trial counsel's decision not to hire an explosives expert was reasonable, the state court explained that declining to call an expert witness aligned with Petitioner's counsel's "sound trial strategy," which involved "keeping he focus off the severity of the blast . . . all while inserting doubt [into] the jurors' minds as to whether [Petitioner] committed the crime." *Id.* Even if, as Petitioner argues in his objections, an explosives expert could have testified regarding the makeup of the bomb *in order to* aid in the broader trial strategy of arguing that Petitioner did not plant it, the Kentucky Court of Appeals established that the decision to *not* hire such an expert was not unreasonable by citing to the Kentucky Supreme Court, which does not require attorneys to "'hire a rebuttal expert witness in order to avoid being deemed ineffective.'" *Biederman*, 2022 WL 3007472, at *6 (quoting *Commonwealth v. York*, 215 S.W.3d 44, 48 (Ky. 2007)). Accordingly, because the Kentucky Court of Appeals concluded that Petitioner's trial counsel "acted within the confines of prevailing professional norms when he decided to focus on [Petitioner] not planting the bomb instead of trying to discount that the bomb existed," its decision was not "objectively unreasonable," *Lockyer*, 538 U.S. at 75, or "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded

disagreement," *White*, 572 U.S. at 420. Petitioner's argument that the state court's decision was an "unreasonable application" of *Strickland* fails.

Petitioner does not appear to argue that the state court's decision is "contrary to" clearly established law under § 2254(d)(1), nor that the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" under § 2254(d)(2). Thus, Petitioner's IAC claim ultimately fails.

As a final note, even if Petitioner's counsel may have served him more effectively by employing an explosives expert in the "harsh light of hindsight," *Harrington*, 562 U.S. at 107, *Strickland* specifically counsels against this sort of hindsight bias: in assessing counsel's performance after the fact, the Court must make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenge conduct, and to evaluate the conduct *from counsel's perspective at the time*." *Strickland*, 466 U.S. at 689 (emphasis added). A strategic error, only determined as such with the benefit of hindsight, does not amount to constitutionally deficient counsel. As such, Petitioner's IAC claim does not warrant habeas relief.

**D. Other Grounds**

As the Court previously noted, *see supra* Section III, the parties' objections only addressed the RD's conclusions as to Ground Two, Ground Four, and Ground Six. *See* [R. 21]; [R. 22]. This Court must only "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); *see also Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Courts need not conduct de novo review of general objections that fail to identify specific factual or legal issues, because it duplicates the magistrate judge's efforts and wastes judicial economy. *Howard*, 932 F.2d at 509. However, despite neither party objecting to the RD's conclusions regarding Petitioner's other asserted

grounds for relief, the Court has nevertheless reviewed those sections of the RD and agrees with the results therein.

The Court agrees that Petitioner's Ground One claim fails to meet the Supreme Court's *Blockburger* test, as each crime for which Petitioner was convicted contains an element the other does not. *Blockburger v. United States*, 284 U.S. 299, 304 (1932). The Court agrees that Petitioner's Ground Three and Ground Five claims also lack merit, since issues of state law are not cognizable in federal habeas, *Estelle v. McGuire*, 502 U.S. 62, 67 (1991), the Kentucky Court of Appeals reasonably determined that Petitioner's attorney obtained Petitioner's consent before agreeing to prohibit jurors from using their notes during deliberations, *Biederman*, WL 3007472, at *5, and the failure of Petitioner's appellate counsel to raise arguments "clearly stronger" than those actually raised on appeal did not violate *Strickland*. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Hutton v. Mitchell*, 839 F.3d 486, 501 (6th Cir. 2016). Finally, the Court agrees that Petitioner's Ground Seven and Ground Eight claims do not warrant relief under *Brady* because exculpatory evidence was provided to Petitioner in time for him to effectively use it at trial. *Brady v. Maryland*, 373 U.S. 83, 90–91 (1963).

Taken together, the Court concludes none of Petitioner's claims for habeas relief are meritorious.

**E. Certificate of Appealability**

The RD recommended that this Court issue a certificate of appealability (hereinafter, "COA") in the event that the Court disagrees with the RD's conclusion that Petitioner is entitled to habeas relief on Ground Two. *See* [R. 20, p. 59]. Petitioner agrees that he is entitled to a COA, arguing in his response to Respondent's objections that because "the Magistrate Judge, an eminently reasonable jurist, found that [Petitioner's] *Alleyne* claim has merit, reasonable jurists

could debate the merits of the claim." [R. 26, p. 9]. Respondent's objections do not address the RD's COA conclusion. *See generally* [R. 21].

This Court may issue a COA "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "Where," as here, "a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). This involves showing that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Id.* (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)). Notably, "[a] claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Buck v. Davis*, 580 U.S. 100, 117 (2017).

Based on the RD's conclusion that Petitioner is entitled to relief on Ground Two, in contrast with this Court's decision that Petitioner is not entitled to such relief, the Court finds that reasonable jurists could debate this Court's determination. Accordingly, the Court will issue a COA.

## IV. CONCLUSION

The Court has reviewed the parties' filings, the RD, and the parties' objections to the RD. Although Respondent only objects to the RD's Ground Two conclusions and Petitioner only objects to the RD's conclusions as to Ground Four and Ground Six, the Court has closely examined the RD's analysis as to Petitioner's other asserted grounds for habeas relief. The Court agrees with

the RD's determinations as to those grounds. Ultimately, this Court concludes that Petitioner is not entitled to relief as to any ground advanced in his habeas petition.

For these reasons, the Court will deny Petitioner's petition for a writ of habeas corpus. Accordingly, and the Court being otherwise sufficiently advised,

**IT IS HEREBY ORDERED** as follows:

1. Petitioner's Petition for Writ of Habeas Corpus, [**R. 1**], is **DENIED**.
2. A Certificate of Appealability **SHALL** issue as to Petitioner's Ground Two claim. The issue that is certified is whether, under *Apprendi* and *Alleyne*, Petitioner's Sixth Amendment rights were violated when the state court judge, rather than the jury, made the factual finding that the victim suffered a serious physical injury and Petitioner was therefore a violent offender required to serve a great period of incarceration before he became eligible for parole.

This the 29th day of September, 2026.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY